**OCEAN TECHNOLOGY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 584–88C.**

United States Claims Court.

Jan. 18, 1990.

Arnold D. Larson, Los Angeles, Cal., for plaintiff.

Allen D. Bruns, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Laura E. Arnold, Defense Contract Admin. Services Region, Los Angeles, Cal., of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on cross-motions for summary judgment. The issue, one of first impression before the Claims Court, is whether, under the Prompt Payment Act, the Government is obligated to pay a contractor interest on a late payment for merchandise which was ordered and accepted pursuant to an option created after the Act's effect date, but which incorporated the terms and prices of a contract entered into before the effective date of the statute. Briefing was limited, as plaintiff did not respond to defendant's cross-motion. During argument plaintiff

advanced a new twist on its argument that the exercise of the option was subject to the Act, and, because plaintiff had not availed itself of its full opportunity to brief its position, the court allowed additional briefing. However, another argument is deemed unnecessary.

## FACTS

The following facts are undisputed. In September 1979 Ocean Technology, Inc. ("plaintiff"), entered into contract No. N00024-79-C-7415 with the Naval Sea Systems Command ("NAVSEA") for, among other things, the manufacture and sale of Trident Signal Data Converters ("TSDC") units. The contract price was $3,081,-820.00. On August 6, 1982, the parties, by mutual agreement, executed contract modification No. P00009, which created option clause J-13, allowing NAVSEA to order up to six additional TSDC units with delivery commencing in November 1985. Modification No. P00011 exercised option J-13 for two TSDC units. This option expired by its terms 120 days after execution of the modification, or on December 5, 1982.

On January 20, 1984, over 13 months later, the parties executed a bilateral modification to the contract, No. P00017, affording NAVSEA with rights to order additional TSDC units and supplies. The 120-day expiration date in clause J-13 was deleted, and inserted in its place was an option period ending on January 23, 1984. Thus, plaintiff and NAVSEA, by this later modification, remodeled expired option J-13 into one that granted purchase rights to NAVSEA for three additional days. Through contract modification No. P00019, dated the same day, NAVSEA ordered two additional units at a price of $562,701.00 each and accompanying installation kits.

NAVSEA accepted delivery of the first TSDC unit ordered under modification No. P00019 on May 30, 1986. The second unit was accepted on July 16, 1986. The Accounting and Finance Office of the Defense Contract Administration, Los Angeles, received invoice No. A7421 for the first unit on June 6, 1986, and invoice No. A7508 for the second unit on July 23, 1986. On August 20, 1986, the Accounting and Finance Office issued a check to plaintiff in the amount of $562,701.00. A second payment of an equal amount was made to plaintiff on or about May 26, 1987.[1]

On August 10, 1987, plaintiff submitted a claim with NAVSEA under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982 & Supp. III 1985), for interest under the Prompt Payment Act (sometimes referred to as the "Act"), 31 U.S.C. §§ 3901–3907 (1982, Supp. I 1983 & Supp. II 1984), *as amended by* Act of Oct. 17, 1988, Pub.L. No. 100–496, 31 U.S.C.A. §§ 3901–3907 (West Supp.1989), with respect to invoice No. A7508. In July 1988 NAVSEA's payment office sent plaintiff a letter stating that, under a February 1, 1983 memorandum issued by the Assistant Secretary of Defense, plaintiff would not receive interest under the Act because the original contract originated prior to the Act's effective date. Plaintiff filed suit in this court on October 11, 1988, seeking payment of interest penalties under the Act.

## DISCUSSION

No issues of material fact impede the grant of summary judgment. Therefore, in order to prevail either movant must establish its entitlement to summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); RUSCC 56(c).

The Prompt Payment Act provides that a governmental agency shall pay a contractor interest on complete, delivered property or services, with certain exceptions, beginning on the date on which payment should

---

1. Plaintiff believes that the first payment that it received was for the first delivery—under invoice No. A7421—and that the second payment was for the later shipment—under invoice No. A7508. Defendant disagrees, asserting that an accounting error delayed payment for the first shipment until May 26, 1987. Defendant argues that the first payment received by plaintiff, on or about August 18, 1987, was for the second delivery. During argument counsel were unable to shed further light on when payment was made for each unit. Although defendant's scenario would inure to plaintiff's benefit, plaintiff does not make claim for the additional interest.

have been made under the contract or 30 days after submission of an invoice. 31 U.S.C. §§ 3902–3903. The Act applies to contracts issued after October 1, 1982. Pub.L. No. 97–177, § 7(a), 96 Stat. 85, 88 (1982). Plaintiff contends that the TSDC units were "acquired" by NAVSEA no earlier than January 1984 when the option granted under modification No. P00017 was created and exercised by modification No. P00019 and that the late payment of invoice No. A7508 therefore is subject to the interest penalty provisions of the Act. Defendant argues that since the options it held were part of the agreement which predated the Prompt Payment Act, the Act does not apply and that, consequently, interest charges are not recoverable for late payments.

Congress enacted the Prompt Payment Act to "provide incentives for the Federal Government to pay its bills on time." H.Rep. No. 461, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.Code Cong. & Admin.News 111. Although both small and large contractors benefit from the Act's interest penalty provisions, the Act is a recognition by Congress that poor accounting practices present their own costs to the Government. "[The Government's] reputation as a slow payer discourages businesses from bidding for government contracts. The Government consequently is deprived of the innovation and lower prices that result from vigorous competitive bidding for contracts." *Id.* The Act theoretically both increases "the number of companies that compete for its business ... [and ends] the contractor practice of inflating estimates to compensate for anticipated late bill payments." H.Rep. No. 461 at 6, 1982 U.S.Code Cong. & Admin.News at 116. The Act's purpose, as outlined in the legislative history, provides no direction as to whether the agreement in this case would fall under the Act's coverage.

According to rules of statutory construction, the court will read a requirement for the United States to pay interest penalties narrowly, as it implicates a waiver of sovereign immunity. "For well over a century, [the Supreme] Court, executive agencies, and Congress itself consistently have recognized that federal statutes cannot be read to permit interest to run on a recovery against the United States unless Congress affirmatively mandates that result...." *Library of Congress v. Shaw*, 478 U.S. 310, 316, 106 S.Ct. 2957, 2962, 92 L.Ed.2d 250 (1986). "In analyzing whether Congress has waived the immunity of the United States, we must construe waiver strictly in favor of the sovereign, and not enlarge the waiver 'beyond what the language requires....'" *Id.* at 318, 106 S.Ct. at 2963 (citations omitted). To waive this traditional immunity, congressional consent "must be express, and it must be strictly construed." *United States v. New York Rayon Importing Co.*, 329 U.S. 654, 659, 67 S.Ct. 601, 604, 91 L.Ed. 577 (1947) (citing cases).

The Act is limited by its own terms to property or services acquired [2] on or after October 1, 1982, the Act's effective date. Although Congress did not define what it meant by "acquired," Congress delegated this rulemaking authority to the Office of Management and Budget ("OMB") to carry out the purposes of the statute. 31 U.S.C. § 3903. In the discharge of this mandate, OMB determined that under the Act, "[i]nterest penalties will apply to payments made under contracts issued on or after October 1, 1982." OMB Circular A–125, § 13, 47 Fed.Reg. 37,321, 37,324 (1982). While acknowledging input from several commentators suggesting that the Act should apply to existing contracts, as well as to post-October 1, 1982 contracts, OMB rejected this suggestion by explaining that the term "acquisition"

includes the *entire process* of contracting, delivery, receipt, and payment. We believe this is consistent with the use of the term in Pub.L. 96–83, the "Office of Federal Procurement Policy Act." More-

---

**2.** The Federal Acquisition Regulations define "acquisition" as beginning "at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, ... contract performance, [and] contract administration...." FAR § 2.101, 48 C.F.R. § 2.101 (1988).

over, the legislative history of S. 1131 is associated with language in that bill that called for interest penalties to be applicable to "payments" rather than "acquisitions." The bill that was enacted, however, refers to acquisitions, rather than payments.

In addition, applying the interest penalty provisions only to contracts entered into after a certain date assures a more orderly administrative transition for the provisions of the Act. It also assures that payment terms will be considered at the same time that other contractual provisions are entered into.

47 Fed.Reg. at 37,322 (emphasis added).

 In reviewing OMB's definition of acquisition, the court must first determine whether the agency's interpretation is based "on a permissible construction of the statute." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). A department's interpretation of a statute it administers must receive considerable deference by a reviewing court, especially when such agency construction involves a reconciliation of conflicting policies. *Id.* at 844, 104 S.Ct. at 2782. Stated otherwise, if the agency's interpretation "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one Congress would have sanctioned." *Id.* at 845, 104 S.Ct. at 2783 (citing *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560–61, 6 L.Ed.2d 908 (1961)).

OMB received broad discretion in implementing the Act's prompt payment policy. As Congress did not mandate affirmatively that the Act must cover pre-October 1982 contracts, OMB applied the Act only to contracts awarded after the Act's effective date. In this way OMB sought to achieve an orderly transition to the new policies. Under OMB rules if contract formation occurred before the effective date of the Act, October 1, 1982, the contract would not be subject to the Act's penalty provisions. To apply the Act to contracts formed before October 1, 1982, would, as the Corps of Engineers Board of Contract Appeals has reasoned, "affect preexisting contractual rights and obligations." *Massman Construction Co.,* ENGBCA No. 4961, 89–1 B.C.A. (CCH) ¶ 21,304, at 107,428 (1988). Further, "retroactive" application of the Act to contracts formed before the statute's effective date would benefit a contractor in a manner not contemplated by the parties during the negotiation process.

Based on the text of the Act and OMB's mandate, OMB's interpretation of the statute is "a reasonable accommodation of conflicting policies." *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783. The interpretation of a statute given by an agency charged with its administration "should be followed unless there are compelling indications that it is wrong...." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) (footnote omitted); *accord Money v. OPM,* 811 F.2d 1474, 1477 (Fed.Cir.1987). Since they represent a reasonable choice between competing policy interests, OMB's regulations should be given effect.

 Interest penalties will not apply to payments made under contracts issued before October 1, 1982. The question for this court to decide, then, is whether the January 20, 1984 bilateral modification was negotiated before the Act's effective date, but exercised and performed after the effective date, or whether it is a new and independent agreement, although mimicking the terms of the original contract.

To call an option to an original contract a second contract, the option must be "the only (or at least the principal) subject matter of the bargain." *1A Corbin on Contracts* § 259, at 464 (1963). For example, if B were to acquire an option from A at a cost of $100 to buy a $10,000 piece of real estate at a later date, the option would be the main subject matter of the bargain and would be a second contract. *Id.* at 460. Conversely, if the option "never constitutes the chief object of desire" for which the contract was negotiated, the option is not a

second contract. *Id.* at 464. This type of contract provision is merely incidental to, and is not separable from, the original contract. In such situations "[t]he exercise of an option in an existing contract is not equivalent to the award of a new and different contract; it is an element in the continuation of a unitary contract package...." *C.M.P., Inc. v. United States,* 8 Cl.Ct. 743, 746 (1985). "The [option] provision is the 'tail of the dog' and not the 'dog' itself," and so may not be a new contract. *1A Corbin, supra,* at 464; *accord C.M.P., Inc. v. United States,* 8 Cl.Ct. at 746 ("The options are essential parts of the total contractual relationship and are in no sense severable from the initial term as far as the obligations of the parties are concerned...."); *Mercantile Services, Ltd.,* ASBCA No. 26386, 82–1 B.C.A. (CCH) ¶ 15,767, at 78,041 ("When an option is properly exercised it extends the existing contract and does not result in a new procurement."). *But see Honeywell Fed. Sys., Inc.,* ASBCA No. 36,227, 89–1 B.C.A. (CCH) ¶ 21,258, at 107, 176 (1988) ("[T]he Government's exercise of the option(s) created new rights for the Government—the opportunity to place orders during ensuing twelve month period(s)—which were not available under the basic contract before the options were exercised...."); *Professional Window & House Cleaning, Inc.,* GSBCA No. 7603, slip op. at 11 (Apr. 2, 1985) (unpubl.) (board found OMB regulation defining "acquisition" contrary to clear meaning of the statute and awarded prompt payment interest for sums wrongfully withheld from contractor after effective date of Act).

■ The facts of the case at bar describe a rare course of dealings in that none of the options exercised was part of the original contractual understanding. Indeed, modification No. P00017 purported to resuscitate the expired option that was itself a modification to the original contract. Thus, the "option" agreement memorialized in modification No. P00017 and implemented by No. P00019 is severable and separate from the original contract.

The modification extended new rights to NAVSEA that were neither part of the solicitation package nor contemplated when the contract was formed in August 1982.[3] The purchase of two additional TSDC units in January 1984, based upon needs that were presumably ascertained after the existing option had lapsed, constitutes "contracting, delivery, receipt and payment". Each of the elements required under the OMB regulation occurred after the effective date of the Prompt Payment Act.

Defendant's position is correct that in the customary situation, where the option is provided for in the original contract, the Government's exercise of the option does not create a new contract.[4] In this case, however, as of the effective date of the Act, October 1, 1982, NAVSEA was not entitled to a purchase option for additional units in January 1984, since its option

---

3. *See Ralden Partnership v. United States,* 891 F.2d 1575 (Fed.Cir.1989). In *Ralden* the original lease expressly incorporated section 322 of the Economy Act of 1932, *as amended,* 40 U.S.C. § 278(a) (1982). This act provided that, if the amount charged to the Government as rent exceeds a certain percentage over the fair market value, the Government is entitled to a refund for that amount. While the original lease was in effect, Congress repealed the Economy Act. The lease provided for rental payments in excess of the ceiling imposed by the Act. The issue, then, was whether the act, as repealed, affected the rental limitation in the original lease. The Federal Circuit held in the negative, reasoning that the parties agreed to be bound by the limits of the act and that the statute is presumed to operate in the future and not retroactively. The Government obtained a refund of the excessive rental payments.

4. *See Jackson v. USPS,* 799 F.2d 1018 (5th Cir. 1986). In *Jackson* the issue was whether, under the Contract Disputes Act, a lease renewal option included in the original contract, but exercised after the effective date of that act, created a new lease or continued the old one. If a new lease came into being, the Contract Disputes Act applied. If no new lease existed, the act did not apply. The court cited *1A Corbin, supra,* at 550, for its ruling that no new lease was created. In dictum the court posited that the cited section from *Corbin* distinguishes between the "exercise of an option to renew lease with exercise of option to purchase, which creates a new contract." *Jackson,* 799 F.2d at 1022. After reviewing *Corbin,* however, this court cannot reach the same conclusion as to the meaning of that language.

rights expired in December 1982. The two options were not part of the original contract. The parties created the first option in August 1982 before the effective date of the Act. The Act would have not applied to it. However, in order to receive additional quantities of the TSDC units, NAVSEA contracted with plaintiff for the second option, delivery of the units, receipt of the units, and payment for the goods—all after the October 1, 1982 effective date of the Act. Under OMB regulations an "acquisition" took place and the Prompt Payment Act provisions apply.[5]

Defendant argues in the alternative that should the court rule that the January 1984 agreement amounted to a new contract, the court should hold further that the agreement violated procurement regulations and that NAVSEA should be held harmless. Defendant states that the provisions of 10 U.S.C. § 2304 (1982), and DAR § 1–1003, 36 C.F.R. § 1–1003 (1983), require the use of free and open competition, in all but limited circumstances, none of which applies here. "Where the failure to follow the applicable procurement regulations is plain," continues defendant, "the Court has no choice but to hold the contract invalid." Def's Br. filed Nov. 24, 1989, at 4 (citation omitted).

Giving OMB's regulation its full force and effect and deferring appropriately to the agency's own explanation of what activities its regulation sought to exempt from the Prompt Payment Act, the second bilateral modification entered into by NAVSEA and plaintiff was not the type of option contract described by Senior Judge Harkins in *C.M.P., Inc.* The special contract provision in that case expressly contemplated the exercise of options by stating that the "contract is renewable at the prices stated elsewhere in the contract, at the option of the Government...." *C.M.P., Inc.*, 8 Cl.Ct. at 744. The options were integral aspects of the original contract and were not severable therefrom. *Id.* at 746.

The modification at issue in the case at bar was not part and parcel of the original contract, nor was it primarily intended to implement the contract. Further, the contract made no provisions for procuring additional quantities of merchandise arguably contemplated as within NAVSEA's needs at the time of formation of the original contract. This option is the classic formulation posited by *Corbin* in that its principal purpose was the availability of the option itself. Although plaintiff and NAVSEA had the opportunity to include an option provision in the original contract, they elected not to do so. As a result, the parties were obliged to create a totally new modification over 13 months after the original option expired. This second modification merits characterization as an independent agreement, one agreed to only after NAVSEA's needs changed. On this basis the draconian choice—that the option comes either under the umbrella of the original contract or is an illegal contract—need not be so framed. However, defendant's postulate that NAVSEA violated procurement regulations in entering the January 20, 1984 bilateral modification should be addressed.

While agreeing that contracts that are neither subject to formal advertising and other competitive procedures nor fall under any statutory exception violate applicable regulations, the court is not of the view that NAVSEA's obligation to pay should be forgiven. It would be manifestly unfair, at this late date, for NAVSEA to retain the benefits of the TSDC units and the time value of the amount due plaintiff while renouncing its contractual obligations. The Federal Circuit would appear to concur. In *United States v. Amdahl Corp.*, 786 F.2d 387 (Fed.Cir.1986), the court expressed this view:

[I]n many circumstances it would violate good conscience to impose upon the contractor *all* economic loss from having entered into an illegal contract. Where a benefit has been conferred by the con-

5. To hold otherwise would mean that the Government could avoid paying Prompt Payment Act interest by, as was done here, deleting the expiration date on lapsed portions of the contract. Allowing such action would thwart Congress' intent in enacting the statute.

tractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated *under* the contract, but rather under an implied-in-fact contract. As stated in *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 628, 320 F.2d 367, 373 (1963):

> Even though a contract be unenforceable against the government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract.... However, the basic fact of legal significance charging the Government with liability in these situations is its retention of benefits in the form of goods or services.

786 F.2d at 393 (emphasis in original). *See also Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1154 (Fed.Cir.1983). Performance having been fully completed, holding the obligation to pay unenforceable is not position favored in this circuit.

The application of the holdings in *Schoenbrod v. United States,* 187 Ct.Cl. 627, 410 F.2d 400 (1969), or *McDonnell Douglas Corp. v. United States,* 229 Ct.Cl. 323, 670 F.2d 156 (1982), cited by defendant, would also be inappropriate on these facts. *Schoenbrod* involved the Department of the Interior's efforts to extricate itself from an unauthorized contract. The Department of the Interior sought rescission of the contract award following a decision against the agency by the Comptroller General. Performance neither had begun nor had been completed at the time the Government sought rescission. Unlike this case the Government had not received benefits under the contract at a time when it argued for not enforcing the contract.

*McDonnell Douglas* concerned allegations by a defense contractor that the Government had infringed upon its patent on the TOW anti-tank missile. Plaintiff sought a ruling excluding a particular patent from its contract with the Government. *McDonnell Douglas* is distinguishable because the Government was neither attempting to disaffirm the contract on the basis of illegality nor unconscionably to retain all of the benefits of the contract for itself. To the contrary, the Court of Claims found that "[t]he most that could be ... done...." to protect plaintiff's rights in technical data was done. 229 Ct.Cl. at 328, 670 F.2d at 160. The court faulted plaintiff for failing to show that the Government ever agreed with plaintiff's position; indeed, it was noted that in order to agree with plaintiff's position, the contracting officer would have had to comply with the controlling regulation, which it did not do. In the case at bar, NAVSEA and plaintiff made precisely the agreement that plaintiff seeks to recognize as within coverage of the Prompt Payment Act. What the court was unwilling to do for the contractor in *McDonnell Douglas* was to ignore a fair and reasonable reading of the contract in favor of a construction that was at odds with both the contract terms and the controlling procurement regulation. *See* 229 Ct.Cl. at 326–28, 670 F.2d at 160–61. A similar choice is not presented to this court upon these facts.

## CONCLUSION

Based upon the foregoing and pursuant to RUSCC 42(c), plaintiff's motion for summary judgment is granted, and defendant's cross-motion for summary judgment is denied. The parties shall file by February 20, 1990, a stipulation of the amount of interest on the sum of $562,701.00, to which plaintiff is due from August 29, 1986, to May 26, 1987, pursuant to 31 U.S.C. § 3902(a). Thereafter, the Clerk of the Court shall enter judgment in accordance with this stipulation, plus interest pursuant to 41 U.S.C. § 611, from August 10, 1987, as authorized by 31 U.S.C. § 3906(b)(2).

The judgment shall provide that no costs have been awarded.

IT IS SO ORDERED.