**Timothy A. JANOWSKY and Peggy J. Janowsky, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

No. 90–3846 C.

United States Court of Federal Claims.

July 3, 1996.

David E. Vandercoy, Valparaiso, IN, for plaintiffs.

Elizabeth A. Rinaldo, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen and Jeanne E. Davidson, Washington, DC, for defendant. Alan E. Michel, Federal Bureau of Investigation, of counsel.

## OPINION and ORDER

TURNER, Judge.

Plaintiffs assert entitlement to damages on theories of contract and Fifth Amendment taking. A prior published opinion, *Janowsky v. United States*, 23 Cl.Ct. 706 (1991), *rev'd and remanded*, 989 F.2d 1203 (Fed.Cir.1993) (Table), describes their claims.

This opinion addresses (1) defendant's motion filed April 10, 1995, for summary judgment with respect to plaintiffs' contract claim (count I of the complaint) and to dismiss plaintiffs' taking claim (count II of the complaint) and (2) defendant's motion filed August 4, 1995, to dismiss the complaint to the extent that it asserts entitlement to quasi-contractual relief. Oral argument was held in Washington, D.C. on March 14, 1996.

We conclude that defendant is entitled to summary judgment on the contract claim. Regarding plaintiffs' taking claim, we conclude alternatively that plaintiffs have failed to state a claim upon which relief can be granted or that we do not have subject matter jurisdiction, and that, consequently, defendant's motion to dismiss count II should be granted. Regarding defendant's motion to dismiss the complaint to the extent that relief of a quasi-contractual nature is sought, we conclude that dismissal is required.

## I

This case has an extensive factual and procedural history. We review the factual background from plaintiffs' (the non-moving parties') perspective.

## A

In 1984, plaintiffs Timothy and Peggy Janowsky agreed to help the Federal Bureau of Investigation infiltrate an alleged extortion ring in exchange for monetary compensation. Plaintiffs cooperated with the FBI by allowing their vending machine business (Geno's Vending) to be used as a front for the FBI investigation. Pursuant to this agreement, plaintiff Timothy Janowsky tape recorded conversations with FBI suspects and agreed to testify before a grand jury and at any trial of individuals charged in connection with the investigation. At the direction of FBI agents, plaintiff purchased and distributed gambling equipment, infiltrated a gambling ring, and helped gather evidence that eventually resulted in recovery of almost $700,000 in back taxes and forfeitures and in thirty-three criminal indictments and convictions.

The Janowskys were promised that in exchange for their cooperation the FBI would reimburse them for any expenses they incurred and at the end of the investigation would either purchase plaintiffs' business at its fair market value (less any rewards they collected) or provide financing for a purchaser. However, at the close of the investigation, the FBI refused to abide by these promises, telling plaintiffs that the FBI agent with whom they had negotiated did not have authority to enter into a compensation agreement. During the course of the subsequent legal proceedings, the FBI offered evidence that Special Agent Kahoe, the FBI representative with whom the Janowskys negotiated, had no authority to contract with plaintiffs. Plaintiffs have conceded that they cannot prove that Agent Kahoe possessed contracting authority.

## B

The Janowskys initially brought suit in a federal district court under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, alleging negligence on the part of the FBI agents with whom they had negotiated, both in failing to obtain proper authority to reimburse plaintiffs for their expenses and in failing to protect plaintiffs from financial loss suffered as a result of their cooperation. The district court dismissed plaintiffs' claim, holding that misrepresentation falls under an exception to the FTCA and that because the Janowskys volunteered to cooperate with the FBI, as a matter of law, the FBI's failure to pay them as promised was not a compensable tort. *Janowsky v. United States*, 713 F.Supp. 282 (N.D.Ind.1989). The

Seventh Circuit affirmed the district court's ruling. *Janowsky v. United States,* 913 F.2d 393 (7th Cir.1990).

## C

The Janowskys then brought this action, alleging, in a two-count complaint, that the FBI breached an implied-in-fact contract to compensate them or, in the alternative, that the FBI's use of their business during the investigation constituted a taking of their property under the Fifth Amendment, entitling them to just compensation. We dismissed count I of plaintiffs' complaint for lack of jurisdiction based on plaintiffs' failure to file a certified claim with the FBI and to receive a final decision on the claim prior to bringing suit, as required under the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613. We dismissed count II for failure to state a claim upon which relief can be granted, holding that the Janowskys' voluntary agreement to allow the FBI to use their property negated their taking claim as a matter of law. *Janowsky v. United States,* 23 Cl.Ct. 706 (1991).

On appeal, the United States Court of Appeals for the Federal Circuit reversed our dismissal of count I for lack of jurisdiction, holding that the CDA had no applicability to the alleged agreement between the Janowskys and the FBI. The Court of Appeals remanded the case for further consideration of the implied-in-fact contract claim. *Janowsky v. United States,* No. 92–5004, slip op. at 8, 1993 WL 36863 at *4 (Fed.Cir., Feb. 17, 1993) (unpublished).

The Federal Circuit also found that the dismissal of count II of plaintiffs' claim for failure to state a claim upon which relief can be granted was premature, vacated the dismissal of count II, and remanded for consideration of whether the Janowskys' property was involuntarily taken by the FBI, if we determine that no implied-in-fact contract existed. *Id.*

## D

On remand, defendant filed on April 10, 1995 one of the dispositive motions we now address. In the exchange of briefs related to its April 1995 motion, defendant perceived that plaintiffs asserted a new claim—or at least a new theory—for quasi-contractual relief based on a theory of *quantum meruit.* On August 4, 1995, defendant filed a separate motion to dismiss the *quantum meruit* "claim".

## II

In its motion for summary judgment on plaintiffs' contract claim, defendant argues that proof of contracting authority is a required element of an implied-in-fact contract with the government. Because plaintiffs concede that they cannot prove that the FBI agents with whom they negotiated had contracting authority, defendant contends that as a matter of law, no implied-in-fact contract existed between the parties.

Plaintiffs argue that notwithstanding their concession regarding authority, adequate support for an implied-in-fact contract claim exists. Plaintiffs contend that an implied-in-fact contract was created between themselves and the FBI when the FBI retained the benefits of using plaintiffs' business to aid in a sting operation. According to plaintiffs, case law supports their entitlement to recover on an equitable basis.

Defendant disagrees with this characterization, arguing that plaintiffs' claim for relief of a quasi-contractual nature is more accurately described as an implied-in-law contract claim than as an implied-in-fact contract claim. According to defendant, because Congress has not waived sovereign immunity with respect to implied-in-law contract claims, plaintiffs' claim is beyond the jurisdiction of any court.

### A. Implied-in-Fact Contracts

An implied-in-fact contract requires the same elements as those of an express contract: a meeting of the minds, mutuality of intent, offer and acceptance, and consideration. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir. 1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474,

482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). An implied-in-fact contract exists when an express offer and acceptance is missing but the parties' conduct indicates mutual assent. *Chavez v. United States,* 18 Cl.Ct. 540, 544 (1989). "Implied-in-fact contracts differ from contracts implied-in-law (quasi-contracts), where a duty is imposed by operation of law without regard to the intent of the parties." *Russell Corp.,* 210 Ct.Cl. at 609, 537 F.2d at 482.

■ When the United States is a party to an express or implied-in-fact contract, an additional element is required: the officer whose conduct is relied upon must have actual authority to bind the government in contract. *City of El Centro,* 922 F.2d at 820; *H.F. Allen Orchards,* 749 F.2d at 1575; *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264 (1981), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981); *Shearin v. United States,* 25 Cl.Ct. 294, 297, *aff'd,* 983 F.2d 1085 (Fed.Cir.1992). The reason for requiring contracting authority is a pragmatic one: "The United States Government employs over 3 million civilian employees. Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States." *City of El Centro,* 922 F.2d at 820 (footnote omitted).

Parties who contract with the United States assume the risk that the government agent with whom they negotiate may not have binding contracting authority or may exceed the scope of his authority in a particular agreement. "[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Id.*

### B. Implied-in-Law "Contracts"

■ A "contract" implied-in-law is not a contract in the sense of an agreement. Rather it is an obligation created when the parties have not come to an actual agreement but "a duty is imposed by equity to prevent injustice." *Chavez,* 18 Cl.Ct. at 545. *See Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1255–56 (1970). Recovery under an implied-in-law contract claim is based on the equitable theory of unjust enrichment. A claim based on unjust enrichment proceeds "from a perception that a party *ought* to be bound rather than from a conclusion that a party has *agreed* to be bound." *Aetna Casualty & Sur. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059 (1981). Applying this theory, where one party has retained the benefits of an agreement, courts may require that the party conferring the benefit receive compensation on a *quantum valebant* (as much as the goods are reasonably worth) or *quantum meruit* (as much as the plaintiff deserves) basis.

It is well settled that this court does not have jurisdiction over implied-in-law contracts. *Hercules v. United States,* —— U.S. ——, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 2968–69, 77 L.Ed.2d 580 (1983); *Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980); *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 472 (1993) ("This court ... may not provide redress for contracts implied-in-law"); *Wainwright Realty Co. v. United States,* 28 Fed. Cl. 425, 426 (1993); *Aetna Casualty & Sur.,* 228 Ct.Cl. at 164, 655 F.2d at 1059; *Russell Corp.,* 210 Ct.Cl. at 609, 537 F.2d at 482; *Porter v. United States,* 204 Ct.Cl. 355 n. 5, 496 F.2d 583, 590 n. 5 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). This concept, expressed in jurisdictional terms, is grounded upon absence of waiver of sovereign immunity.

### III

■ Defendant maintains that because plaintiffs concede that they cannot prove authority on the part of the government agent, as a matter of law no contract existed, and, consequently, that we lack jurisdiction over the case. The Tucker Act provides the Court of Federal Claims with jurisdiction over claims "founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). So long as a contract

has been properly alleged, jurisdiction will usually exist. *Total Medical Management, Inc. v. United States,* 29 Fed.Cl. 296, 301 (1993).

Here, the existence of a properly alleged contract is in dispute. Defendant contends that absent proof of authority, no contract can exist. Plaintiff responds that the government's retention of benefits is sufficient to create an implied-in-fact contract between the parties. "The existence of a contract is at its core more of a merits than a jurisdictional issue." *Total Medical,* 29 Fed.Cl. at 301. Therefore, for the court to resolve the issues presented by these opposing arguments requires us to take jurisdiction over the merits of the case.

We conclude that defendant's attack on the existence of a contract is appropriately characterized as a challenge to plaintiffs' case on the merits rather than to the court's jurisdiction. Consequently, we assume jurisdiction and proceed to address the merits.

## IV

▬▬▬ Defendant moves for summary judgment on plaintiffs' contract claim, arguing that because plaintiffs cannot prove authority on the part of the government agent with whom they contracted, their claim must fail. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir. 1987). A "material fact" is a fact that could make a difference in the outcome of a case. *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Only disputes over facts that might affect the outcome of a suit properly will prevent the court from entering summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Actual authority is a prerequisite to an implied-in-fact contract with the government. Plaintiffs concede that they cannot prove that Agent Kahoe had contracting authority.

Consequently, defendant is entitled to summary judgment on plaintiffs' contract claim.

## V

Unable to prove that an authorized official approved a contract with them, plaintiffs respond that the FBI's acceptance of goods and services that plaintiffs provided—specifically, the use of their business in a sting operation—created an implied-in-fact contract between the parties. It is plaintiffs' contention that they are entitled to quasi-contractual relief under this implied contract. Defendant characterizes plaintiffs' argument as based on implied-in-law contract theory and moves to dismiss plaintiffs' claim to the extent it asserts entitlement to quasi-contractual relief.

It is hornbook law that the United States cannot be sued without its consent. 14 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3654 186 (1985). *See also United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983) (only when Congress has consented for the United States to be sued does any court have jurisdiction over a claim against the government); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (as a sovereign, the United States is "immune from suit save as it consents to be sued").

▬▬▬ For any court to have power to adjudicate a claim against the United States there must be both a grant of authority and a Congressional waiver of sovereign immunity. *Eastern Trans–Waste of Maryland, Inc. v. United States,* 27 Fed.Cl. 146, 149 (1992). The Tucker Act, 28 U.S.C. § 1491, grants the Court of Federal Claims authority over contract dispute suits against the United States. Section 1491(a) states that the Court of Federal Claims has jurisdiction to "render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (1988). The Tucker Act also constitutes a waiver of sovereign immunity with respect to the claims specified in the Act. *Mitchell,* 463 U.S. at 212, 103 S.Ct. at 2965; *United Elec. Corp. v. United States,*

227 Ct.Cl. 236, 647 F.2d 1082, *cert. denied,* 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981).

 Waivers of sovereign immunity are interpreted narrowly, suggesting that any doubt as to the extent of a court's authority and jurisdiction over a suit against the government should be resolved in favor of the United States. *See Lane v. Pena,* —— U.S. ——, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *Morgan v. United States,* 12 Cl.Ct. 247, 253 (1987). The Supreme Court has specifically addressed the issue of Congressional waiver of immunity to suit in the Court of Federal Claims, holding that "jurisdiction to grant relief depends wholly upon the extent to which the United States has waived its sovereign immunity to suit and . . . such a waiver cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969).

 The Tucker Act's waiver of immunity over implied government contract claims is limited. To properly invoke the jurisdiction of the Court of Federal Claims under 28 U.S.C. § 1491, the "implied" contract must be an implied-in-fact contract, not one implied-in-law, because "although the Tucker Act refers to claims founded upon any implied contract with the United States, [the Supreme Court has] held that the Act does not reach claims based on contracts implied in law, as opposed to those implied in fact." *Mitchell,* 463 U.S. at 218, 103 S.Ct. at 2968–69. *See also Hercules v. United States,* —— U.S. ——, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980); *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). Implied-in-law contracts are "beyond the Congressional grant of power to courts considering government contract cases." *Eastern Trans–Waste of Maryland,* 27 Fed.Cl. at 151.

## VI

 Plaintiffs argue that they have offered substantial credible evidence to prove that the government took "extensive services from [them], used their business knowing the business would be ruined by such use, derived enormous benefits, including hundreds of thousands of dollars in cash or assets, and now refuses to pay for the services or use of the business." Pl.'s Br. in Opp'n to Def.'s Mot.Summ.J. at 6. It is plaintiffs' assertion that they are entitled to recover in contract based on a retention of benefits theory.

Plaintiffs cite a trilogy of cases as support for their claim for quasi-contractual recovery, relying on *United States v. Amdahl Corp.,* 786 F.2d 387, 394 (Fed.Cir.1986); *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147 (Fed.Cir.1983); and *Ocean Technology, Inc. v. United States,* 19 Cl.Ct. 288 (1990). These cases establish a general right to recover on a retention of benefits theory when a partially performed contract is rescinded for illegality. However, none of them involves lack of authority on the part of the contracting government agent. These cases do not create an exception to the rule that authority is a required element for an implied-in-fact contract.

In *Urban Data Systems,* the price terms of two subcontracts issued under a government contract were invalidated for violation of federal law and regulations. The court found that because the government had bargained for, agreed to pay for, and accepted the supplies delivered by the plaintiff, the plaintiff was entitled to recover "on a *quantum valebant* basis for the reasonable value in the marketplace of the supplies and concomitant services." *Urban Data Sys., Inc.,* 699 F.2d at 1154. The subcontracts at issue in *Urban Data Systems* were illegal not because the contracting officer lacked authority, but because the agreements did not meet statutory requirements.

In *Ocean Technology, Inc.,* the court granted compensation on a *quantum valebant* or *quantum meruit* basis when a government contract was held invalid based on violations of applicable advertising and competitive bid procedure regulations. In granting relief, the court stated that it would be "manifestly unfair" for the government to retain the merchandise and the time value of the amount it owed. *Ocean Technology, Inc.,* 19 Cl.Ct. at 293. As in *Urban Data Systems,*

the contract in *Ocean Technology* did not fail for lack of authority, rather it was invalidated because it did not meet statutory requirements.

Plaintiffs rely most heavily on *Amdahl*. *Amdahl* concerned an appeal from the Government Services Board of Contract Appeals (GSBCA) in a bid protest proceeding brought under the Brooks Act, 40 U.S.C. § 759 (1982) as amended by the Competition in Contracting Act of 1984 (CICA), Pub.L. No. 98–369, § 2713, 98 Stat. 494, 1182 (1984). At issue in *Amdahl* was a contract for the purchase of a used mainframe computer awarded by the Department of the Treasury to the Federal Home Loan Mortgage Corporation (Freddie Mac). The Amdahl Corporation successfully protested the award. GSBCA agreed with Amdahl's claim that the contract violated the rules governing Treasury's procurement authority, held the contract void for illegality and revoked Treasury's procurement authority in accordance with the applicable statutory remedy (40 U.S.C. § 759(h)(5)(B)).[1]

Following this decision, Treasury filed a motion seeking clarification of GSBCA's ruling regarding relief. The statute governing the contract contained a specific provision holding that a contract is presumed valid with respect to goods and service delivered and accepted prior to revocation.

> If the board revokes, suspends, or revises the procurement authority of the Administrator or the Administrator's delegation of procurement authority after the contract award, the affected contract shall be presumed valid as to all goods and services delivered and accepted under the contract before the suspension, revocation, or revision of such procurement authority or delegation.

40 U.S.C. § 759(h)(6)(B).

Treasury asked that GSBCA "rule that because the computer equipment had been 'delivered and accepted' within the meaning of § (6)(B) ... Treasury's agreement with Freddie Mac was valid with respect to those goods...." *Amdahl*, 786 F.2d at 391. In effect, Treasury was asking that it be allowed to keep the equipment it had already received and be permitted to pay for the equipment. GSBCA denied Treasury's request, ruling that 40 U.S.C. § 759(h)(6)(B) did not apply because the computer equipment had not been "delivered" to Treasury and that Treasury had a duty to recover the initial payment of $1.2 million made to Freddie Mac. *Id.* at 391–92.

Treasury appealed the portion of the decision affecting remedy and the Court of Appeals for the Federal Circuit reversed the GSBCA ruling, holding that the facts indicated that Treasury had received delivery and accepted the goods at issue. The Court of Appeals held that § 6(B) applied and that Treasury was not required to return the equipment or recover the $1.2 million already paid to Freddie Mac.

To the extent plaintiffs argue that *Amdahl* creates a general *equitable* right to quasi-contractual relief, we disagree. *Amdahl* could not create a general right to equitable relief because it involved a specific *statutory* relief provision.

Nonetheless, plaintiffs rely on *Amdahl* to support their claim for equitable relief, citing language in the opinion that suggests equitable relief might be available under an agreement that the court labeled an implied-in-fact contract. The court in *Amdahl* stated that although the contract at issue in the case was invalid, the contractor was "not entirely without remedy" because:

> Where a benefit has been conferred by the contractor on the government in the form of goods or service, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods received by the government prior to the recision of the contract for invalidity.

*Id.* at 393.

As with *Urban Data* and *Ocean Technology*, *Amdahl* is distinguishable from plaintiffs' situation because contracting authority was not at issue in the case. As with the other two cases, the contract in *Amdahl* was re-

---

1. The subsection (h) of 40 U.S.C. § 759 at issue in *Amdahl* has been relettered (f) and the two paragraphs referred to in text are now found at 40 U.S.C. § 759(f)(5)(B) and (f)(6)(B). To avoid confusion, we use the original subsection designations used in the *Amdahl* opinion.

scinded not because the government representative lacked authority, but because it violated statutory and regulatory requirements.

Courts have applied the *Amdahl* ruling narrowly, refusing to extend it to situations where authority itself is in issue. The court in *Chavez v. United States,* 18 Cl.Ct. 540, 547 (1989), refused to apply *Amdahl* to a situation in which government contracting authority was lacking, holding that *Amdahl* should only apply in "limited circumstances ... when a contract was in fact entered into by persons authorized." *Id.* Identical reasoning was applied in *Mega Constr. Co.* 29 Fed. Cl. at 472 ("The theory of contracts implied-in-fact espoused in *Amdahl* only applies ... where the contract, was ... entered into by persons so authorized."). *See also H. Landau & Co. v. United States,* 16 Cl.Ct. 35, 39 (1988), *vacated and remanded on other grounds,* 886 F.2d 322 (1989) (holding that *Amdahl* "only identifies an exception to the rule of total governmental non-liability in circumstances of recision for illegality").

Plaintiffs refer specifically to the following passage in *Amdahl:*

> Even though a contract be unenforceable against the Government, because not properly advertised, *not authorized,* or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract.

*Amdahl,* 786 F.2d at 393 (emphasis added). This passage is taken directly from *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 628, 320 F.2d 367, 373 (1963). We find it instructive to review this passage in the context of the original opinion.

In *Prestex,* the claimant applied for a contract to supply cloth for uniforms for the Military Academy, submitting a bid that contained exceptions to the contract specifications. The government refused to accept delivery of the cloth because the cloth did not meet bid specifications. Plaintiff claimed that when the government accepted the bid containing the exceptions an enforceable contract was created and refusal of delivery constituted a breach of that contract. The court refused to grant plaintiff's desired relief, holding the contract invalid because plaintiff's bid was at material variance with the terms of the bid proposal. The *Prestex* court did state that where a contract is held invalid, a contractor may still recover the value of the benefits retained by the government, but found that the government's refusal of delivery resulted in no benefit being conferred. *Id.* at 626–27, 320 F.2d 367. Thus, *Prestex,* like *Urban Data Systems, Ocean Technology* and *Amdahl,* involved a contract that was held invalid for violation of statutory requirements and not an agreement that failed for lack of contracting authority.

The *Prestex* language quoted above and in *Amdahl* may seem to support plaintiffs' claim. However, as neither *Prestex* nor *Amdahl* directly involved contracting authority, the language in this passage referring to unauthorized agreements is dictum. This passage of dictum in *Prestex* is simply not sufficient to overcome what one court referred to as the "overwhelming array of precedent" refusing to allow recovery where an agreement lacks governmental authority or where plaintiffs seek compensation based on a theory of unjust enrichment. *H. Landau,* 16 Cl.Ct. at 40.

## VII

It is true, as plaintiffs contend, that this court has compensated would-be contractors when the government has retained the benefits of contracts that were voided for illegality. However, in each case where relief was granted, the contract at issue was initially entered into with proper authorization and only later rescinded. We find these cases readily distinguishable from the Janowskys' situation where no binding contract was ever created. Furthermore, we do not read these cases to create an exception to the general rule that actual authority is an absolute requirement for the creation of a contract with the government.

We conclude that plaintiffs have failed to establish the contracting authority of the government agent with whom they negotiat-

ed and consequently no express or implied-in-fact contract could exist between plaintiffs and the government. It follows that defendant is entitled to judgment on the contract claim.

## VIII

In count II of the complaint, plaintiffs assert that their property was taken by the FBI's use of their business as a front "to the exclusion of their ability to run the business as a viable, for profit entity." Defendant moves to dismiss plaintiffs' taking claim for failure to state a claim upon which relief can be granted, or, alternatively, for lack of jurisdiction. According to defendant, plaintiffs have failed to allege facts sufficient to meet the threshold of a taking claim, plaintiffs' voluntary cooperation with the FBI negates the required coercive element to a taking, and plaintiffs' claim sounds in tort.

Plaintiffs argue that defendant's motion to dismiss the taking claim for failure to state a claim should be treated as a motion for summary judgment because defendant relies on materials outside the pleadings. Plaintiffs further contend that genuine issues of fact regarding the voluntariness of their actions preclude summary judgment.

On February 17, 1993, the Court of Appeals for the Federal Circuit remanded plaintiffs' taking claim to this Court for reconsideration.

> In order to grant a motion to dismiss for failure to state a claim, a court must determine that there is no set of facts under which the plaintiff could recover.... This cannot be said here. The court on remand should reconsider whether Janowsky's property was involuntarily taken by the FBI if it determines there was no implied-in-fact contract with the FBI.

*Janowsky v. United States,* No. 92–5004, slip op. at 8, 1993 WL 36863 at *4 (Fed.Cir., Feb. 17, 1993) (unpublished) (citation omitted).

Plaintiffs contend that because their conduct was induced by false promises, it was not voluntary. However, plaintiffs do not allege that they didn't agree to cooperate with the FBI, rather they argue that they were induced by false promises and that they

agreed only because the FBI misrepresented the benefits plaintiffs would receive for cooperating. False inducement and misrepresentation are tort theories. *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961); *Somali Dev. Bank v. United States,* 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974) ("claims based on negligent misrepresentation, wrongful inducement, or the careless performance of a duty allegedly owed, are claims sounding in tort"); *Montego Bay Imports, Ltd. v. United States,* 25 Cl.Ct. 639, 658 (1992) (claim appears "to fall within the common law principles of misrepresentation or inducement which are clearly tortious in nature."). *See also Aetna Casualty & Sur. Co.,* 228 Ct.Cl. at 164, 655 F.2d at 1059; *Dakota Tribal Indus. v. United States,* 34 Fed.Cl. 295, 297 (1995); *Reforestacion de Sarapiqui v. United States,* 26 Cl.Ct. 177 (1992), *aff'd,* 985 F.2d 583 (Fed.Cir.1992) (Table).

The record shows that plaintiffs acted voluntarily in allowing the FBI to use their business. It may be, and we assume for purposes of ruling on defendant's motion, that plaintiffs cooperated only because they were misled by FBI agents who promised them compensation for their cooperation. Voluntary action cannot give rise to a taking, and a suit based on misrepresentation is a tort claim. Therefore, we conclude that defendant's motion to dismiss should be granted whether or not plaintiffs' voluntary actions were induced by misrepresentation. If plaintiffs acted voluntarily, their taking claim lacks the necessary element of coerciveness and consequently they have failed to state a claim upon which relief can be granted. Conversely, if plaintiffs did not act voluntarily, it was because they were misled by government misrepresentations. As a claim based on misrepresentation sounds in tort, such a claim would have to be dismissed for lack of jurisdiction.

As we have previously determined, there is no dispute (and therefore no "genuine issue" under RCFC 56(c)) over the facts that plaintiff Timothy Janowsky voluntarily consented to act as an informant to the FBI and to allow his business to be used as a front in a sting operation. In our initial opinion, we

did not require defendant to prove the voluntariness of plaintiffs' action "because the Janowskys make that very allegation in their complaint." *Janowsky*, 23 Cl.Ct. at 716 n. 11.

In their original complaint, plaintiffs stated that Timothy Janowsky "was recruited by Special Agents of the FBI to assist them and the FBI in ongoing investigations" and that Janowsky "cooperated and assisted the FBI and acted as directed by the FBI." Compl. at 2–3. "Recruitment", "cooperation" and "assistance" are not the terms of compulsion, rather they unambiguously bespeak voluntary action.

Two previous courts considering the Janowskys' claim both specifically noted that the Janowskys' cooperation with the FBI was voluntary. The district court considering the Janowsky's initial tort claim held:

Janowsky voluntarily undertook specific actions in reliance on specific representations made to him only: promises that if he aided in an investigation he would be reimbursed, his family would be protected etc.... [W]ithout the government's false promises, Janowsky would not have been harmed because he would not have participated in the undercover operation.

*Janowsky v. United States*, 713 F.Supp. 282, 284 (N.D.Ind.1989). On appeal, the Seventh Circuit noted that the Janowskys themselves characterized their complaint as based on their voluntary agreement to help the FBI: "Plaintiffs argue that the complaint should be construed to allege that Janowsky gratuitously volunteered to cooperate...." *Janowsky v. United States*, 913 F.2d 393, 397 (7th Cir.1990).

Plaintiffs allowed the FBI to use their business in a sting operation because they believed they would be compensated financially. When the investigation was complete, plaintiffs were denied the compensation they had been promised and were instead offered a less valuable reward. Understandably disappointed, plaintiffs brought suit against the government. However, the FBI's subsequent mistreatment of plaintiffs cannot negate the voluntariness of their initial agreement. The fact that the agreement plaintiffs thought was a binding contract turned out to be void for lack of authorization does not convert the voluntary nature of plaintiffs' initial cooperation into a coerced servitude. As we previously determined, "a property owner who voluntarily delivers property to the government pursuant to an agreement cannot later maintain an inverse condemnation claim if the government refuses to pay as agreed." *Janowsky*, 23 Cl.Ct. at 711.

We adopt and rely upon the authorities cited and the explanation set forth in *Janowsky*, 23 Cl.Ct. at 711–716, concerning the principle that, as a matter of law, there can be no taking in the voluntary circumstances of this case.

The facts and procedural history of this case are similar to those in *Adams v. United States*, 20 Cl.Ct. 132 (1990). In *Adams*, a group of investors brought suit against the government when an investment banking firm went bankrupt and its major officers and directors were indicted on multiple charges of fraud. Plaintiffs alleged that the CIA had taken their property for public use by operating the firm to fund intelligence activities.

Plaintiffs in *Adams* argued multiple bases for recovery, including the claim that the CIA's negligent supervision of the firm's activities had resulted in plaintiffs' loss and that the loss was a compensable taking. The Court of Federal Claims found this claim to be based in tort and therefore beyond its jurisdiction under 28 U.S.C. § 1491(a)(1).

Plaintiffs in *Adams* argued that the Court of Federal Claims had jurisdiction over their suit because the Ninth Circuit had dismissed a previous attempt to argue the claim as a tort, finding that their cause of action for misrepresentation was either not compensable under the Federal Tort Claims Act (FTCA) or fell under the discretionary function exception to the FTCA. *Frigard v. United States*, 862 F.2d 201 (9th Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989). Plaintiffs in *Adams* contended that the *Frigard* court's finding that their claim was not a compensable tort proved that the CIA's action was a policy decision to appropriate private property. The Court of Federal Claims rejected

this "what is not a tort must be a taking" theory: "To the contrary, the Ninth Circuit did not say that the claim now before this court involves a taking rather than a tort. Rather, the Ninth Circuit stated that the *Frigard* action fell within non-compensable exceptions to the Federal Torts Claims Act." *Adams*, 20 Cl.Ct. at 135.

As in *Adams*, the Janowskys initially brought action in district court under a misrepresentation claim. When their claim was rejected as failing under a noncompensable exception to the FTCA, they brought the present action, pleading alternatively contract and taking. That plaintiffs cannot successfully recover under a tort claim because the facts of their case fall within an exception to the Federal Tort Claims Act may seem unjust, but it does not grant plaintiffs the legal right to recourse in this court. A sympathetic situation cannot convert a tort or an unauthorized contract into a taking, nor can it create jurisdiction where none exists.

## IX

For the forgoing reasons, defendant's motion filed April 10, 1995, for summary judgment with respect to plaintiffs' contract claim (count I of the complaint) and to dismiss plaintiffs' taking claim (count II of the complaint) for failure to state a claim or, alternatively, for lack of subject matter jurisdiction is GRANTED. Further, defendant's motion filed August 4, 1995 to dismiss plaintiffs' quasi-contract claim is GRANTED.

Accordingly, (1) judgment shall be entered in favor of defendant with respect to count I of the complaint, and (2) judgment shall be entered dismissing count II of the complaint.

Each party shall bear its own costs.