**TELEX COMMUNICATIONS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–475C.**

United States Court of Federal Claims.

April 16, 1998.

Victor E. Covalt, III, Lincoln, NE, for plaintiff.

Brian M. Simkin, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Holly K. Salamido, Office of the General Counsel, Library of Congress, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after argument on cross-motions for summary judgment. The issues to be decided are 1) whether purchase orders constitute binding modifications to a fixed-price contract and 2) whether the contracting officer could correct a prior misapplication of a negotiated escalation rate and recoup an overpayment by offsetting a subsequent contract award to plaintiff.

## FACTS

### 1. The solicitation provisions

The following facts are undisputed. On July 17, 1991, the Library of Congress (the "LOC") issued Solicitation No. RFP91–37 (the "RFP") seeking proposals to supply to the National Library Service for the Blind and Physically Handicapped 42,000 "C–1 Cassette Talking Book Machines," which are specially-designed audio cassette players used in its "talking book program."

The RFP provided for a base year and two option years. Although the RFP required offerors to submit a fixed price for each talking book machine and required a three-year warranty on each machine for the base year, the RFP also provided that upon the exercise of each option year, the fixed prices would be adjusted according to two price adjustment clauses. First, contract section G.3, a "yen adjustment" clause, applied to the portion of the unit price that reflected materials originating in Japan and purchased with yen. It also gave an example of a cost breakdown of the "[t]otal firm-fixed unit price on which award is based." Second, section G.2, "Escalation Rate for Option Years," provided that "[t]he escalation rate shall be negotiated with [the] exercise of

each option year. The escalation rate shall not exceed the Consumer Price Index...."[1] The parties and contracting officer have also referred to this clause as the "CPI adjustment clause" and the adjustment factor as the "CPI rate." Contract section G.2(2) instructed the LOC contracting officer to "notify the contractor in writing of the percentage increase or decrease to be applied to any invoices to be submitted for orders subject to price adjustment in accordance with this clause.... The contractor shall apply the percentage increase or decrease against the total price of the invoice costs."

The contract also contained an option clause. Section 1.3 52.217-06 Option for Increased Quantity (Mar.1989), provides:

> The Government may increase the quantity of supplies called for in the Schedule at the unit price specified. The Contracting Officer may exercise the option by written notice to the Contractor *any time during the performance of this contract up to the acceptance of the last machine.* Delivery of the added items shall continue at the same rate as the like items called for under the contract, unless the parties otherwise agree.

Telex Communications, Inc. ("plaintiff"), submitted its Best and Final Offer ("BAFO") by letter dated November 15, 1991. The BAFO, based on anticipated costs for labor, materials, overhead, and profit, was $141.29 per unit for the talking book machine and $12.36 per unit for each three-year warranty. The price per unit included the expected cost of materials to be purchased from Japan in yen, which was $45.82 and $107.83 for "all other costs," including profit, totaling $153.65 per machine. Based on its BAFO, on December 19, 1991, plaintiff was awarded Contract No. 170243, which expired on December 20, 1994.

### 2. *Implementation of the contract*

During the base year of the contract, plaintiff delivered and LOC paid for 42,000 talking book machines in accordance with the contract schedule. Anticipating the LOC's exercise of the first option year, "Option Year One," on November 17, 1992, Kaye Klinker, the LOC's contracting officer, sent plaintiff a proposed 2% escalation rate, calculated under the CPI adjustment clause.[2] Plaintiff responded with an "option year one adjustment calculation," using the 2% escalation rate, for a total of $158.81 per unit.[3] On November 17, 1992, Ms. Klinker exercised Option Year One by issuing a purchase order for 45,000 talking books at the adjusted price of $158.81. Plaintiff supplied the machines, and no dispute exists regarding the price or the performance of the contract for Option Year One.

On September 24, 1993, anticipating the LOC's exercise of Option Year Two, the contracting officer sent plaintiff a proposed escalation rate of 4.02%, pursuant to the CPI adjustment clause found in contract section G.2. Plaintiff then submitted to Ms. Klinker an "option year two adjustment" by applying a 4%[4] CPI rate to the previously adjusted figure of $109.99, for a total of $4.40. Plaintiff attached a computation page that enu-

---

1. The CPI adjustment clause, section G.2(1), states specifically:
   The contract price of orders placed during the adjusted period (excluding reimbursable postage or transportation costs) shall be adjusted by the percentage increase or decrease in the average, seasonally adjusted Consumer Price Index for Commodities less Food as follows: An index shall be calculated by averaging the 12 seasonally adjusted months ending 3 months prior to the expiration of the first period of the contract. This average is then compared with the average index for the 12-month period ending 3 months prior to the beginning of the index, called the base index. The percentage increase or decrease by comparing these two indexes shall be applied to the contractor's invoices for orders placed during the adjustment period.

2. This escalation rate was calculated by comparing the change between the "base index" (average CPI index for the 12-month period ending August 1991) with the average CPI index for the 12-month period ending August 1992.

3. The "all other costs" figure of $107.83 was multiplied by the 2% escalation rate to arrive at $2.16, which, when added to a $3.00 proposed yen adjustment and the $153.65 base price, totaled an adjusted price for Option Year One of $158.81 per unit.

4. It is unclear why plaintiff applied a 4% rate, as opposed to the 4.02% increase that it was allowed.

merated the "all other costs" figure; the prior 2% CPI adjustment clearly was included in the current "all other costs figure." Whether this calculation was correct, and is now binding, is at the heart of the parties' dispute.

Adding the $4.40 CPI adjustment to a proposed yen adjustment of $7.37 and to the adjusted unit price of $158.81, the total adjusted price for Option Year Two was $170.58 per unit. On or about September 23, 1993, Ms. Klinker exercised Option Year Two by issuing Purchase Order M70243 for 46,711 talking book machines at the adjusted price of $170.58 per unit. On March 2, 1994, the contracting officer requested that plaintiff stop including a "patron postal card" with the shipment of each unit. This change resulted in an reduction of the unit price from $170.58 to $170.56, and was implemented by the contracting officer's issuance of a purchase order revising the Option Year Two prices.

On July 11, 1994, increased demand for the talking book machines prompted Ms. Klinker to issue a purchase order to exercise the LOC's "July 1994 Option," under contract clause I.3, to increase the quantities of the machines by 11,726 at the price of $170.56 per unit. By letter dated July 29, 1994, plaintiff proposed a yen adjustment of $4.24 per unit to reflect changes in the dollar-to-yen exchange rate. No CPI adjustment was made, but the unit price was calculated using the figure derived during Option Year Two and the subsequent postal card modification. On August 4, 1994, Ms. Klinker issued a revised purchase order, and the parties executed a bilateral contract modification to increase the July 1994 Option price per unit from $170.56 to $174.80, for a total increase of $2,049,704.80 under Option Year Two of the contract.

**5.** The March 1995 Order constituted Purchase Order 95CLCDV3003 dated March 31, 1995, and Contract Modification No. 4, signed March 29, 1995. Through the purchase order, the LOC exercised the option to increase the quantity of C–1 Machines by 7,234 machines at $182.61 per machine, for a total cost of $1,317,000.74.

**6.** Again, this calculation differed from the application of this rate, which was the error in calculating Option Year One and the July 1994 Option. In her decision, Ms. Klinker explained:

### 3. Contracting officer's decision

By letter dated March 22, 1995, Ms. Klinker informed plaintiff of an error in calculating the adjusted unit prices for Option Year Two (September 1993) and the July 1994 Option. According to Ms. Klinker, the 4% escalation rate should have been applied to the original "all other costs" figure of $107.83 rather than to $109.99, which represents the sum of the original figure and the $2.16 CPI adjustment that had been applied to Option Year One. The same misapplication error affected the calculation of the July 1994 Option. The contracting officer determined that this computational error—made for Option Year One and carried over into the July 1994 Option—resulted in an overpayment to plaintiff (or a credit to the LOC) in the amount of $116,569.14. Plaintiff protested the issuance of a credit to the LOC in a letter dated September 11, 1995:

> We have reviewed your claim for an adjustment to the price on contract [I]70243. We find your claim to be without merit, unsubstantiated and not timely. Your request for additional moneys on a contract delivered long ago, based on a negotiated adjustment to a previously agreed upon price, is entirely outside the scope of the contract in question, FARs [the Federal Acquisition Regulation] and general principles of contract law.

The contracting officer subsequently discovered an additional overcharge of $11,212.70 for the increased quantities ordered in March 1995,[5] due to an incorrect calculation of the CPI rate itself.[6] On November 3, 1995, Ms. Klinker issued a final written decision:

> Telex has never disputed the fact that the CPI rate was inappropriately applied but

> [T]he negotiations to establish a new price for additional quantities in March, 1995 under order 95CLCDV3003 (Attachment H) were flawed because the provisions of the contract for an adjustment to the CPI are to be made every 12 months, not when options to increase quantities are exercised as is the case for the dollar-to-yen adjustment. Therefore, the application of the 6.6% [rate] to the price was incorrect and the application of the previous rate of 5.16% should have been applied.

rather that because it was a "negotiation" and the price was accepted by the Contracting Officer, the price decided at the time of order prevailed. However, Telex failed to take into consideration the rights of the Library pursuant to FAR 52.215–22 Price Reduction for Defective Cost or Pricing Data (Apr.1988) (Attachment C). This clause states, pursuant to FAR 15.804–7(b)(1), that the Library is entitled to a price adjustment, including profit or fee, of any significant amount by which the price was increased because of the defective data.

To recover the overpayments totaling $127,781.84, on December 4, 1995, the LOC offset this amount against an invoice for another pending contract with plaintiff,[7] as plaintiff's final invoice on Contract I70243 had been paid earlier.

### 4. *Appeals officer's decision*

By letter dated January 30, 1996, plaintiff appealed the contracting officer's decision to Charles S. Fulmore, Chief of the LOC's Division of Contracts and Logistics Services and Ms. Klinker's immediate supervisor. Plaintiff advanced three arguments: 1) It did not furnish defective pricing data, so Federal Acquisition Regulation ("FAR") § 52.215–22, 48 C.F.R. § 52.215–22 (1996), was inapplicable; 2) fair and open negotiations produced binding contractual obligations upon the LOC regarding agreed-to prices; and 3) plaintiff should have an opportunity to claim an equitable adjustment if the contracts are subject to being reopened by the LOC.

Mr. Fulmore issued a decision on May 8, 1996, essentially sustaining the contracting officer's final decision, except for the subsequently discovered overpayment of $11,212.70. The appeals officer determined that this alleged overpayment was not the result of misapplying the CPI adjustment to an already adjusted "all other costs" figure, but, rather, was due the use of an incorrect esca-lation rate (applied to the March 1995 Order) that was negotiated in good faith and thus bound the parties. He thereby distinguished between the calculation of the escalation rate and the application of this rate to a base figure: The former was "open to interpretation," negotiable, and enforceable, whereas the latter was a non-negotiable matter of mechanical contract application. This distinction is essential to both the appeals officer's decision and that of the court.

Regarding the allegedly defective costs, Mr. Fulmore noted that the unit prices for Option Year Two and the July 1994 Option resulted from a CPI adjustment and were determined by "a specified formula and not an pre-agreed upon amount." The prices were deemed defective as a result of the "misapplication" of a negotiated escalation rate, which was "not an 'interpretation of contract language,' but rather a simple mistake." Mr. Fulmore explicated that using the already adjusted "all other costs" figure from Option Year One to calculate the adjustment for Option Year Two was "essentially providing for a double adjustment." He concluded that the negotiated CPI rate for Option Year Two was misapplied to then-current "all other costs" figure of $109.99 instead of the original "all other costs" figure of $107.83.

Plaintiff filed the instant action challenging the decisions of the contracting and appeals officers as arbitrary and capricious and made in bad faith. Plaintiff argues that the exercise of the options comprises "binding contractual obligations of the Contracting Officer, enforceable in accordance with the terms thereof and are not subject to being set aside or modified by unilateral action of the Contracting Officer." Compl. filed Aug. 5, 1996, ¶ 32. In addition to its breach of express contract claim under 28 U.S.C. § 1491(a)(1) (1994), plaintiff also seeks recovery for a taking without just compensation under the Fifth Amendment.[8]

---

**7.** The LOC exercised its common-law right to offset contract debts to the Government against contract payments due the contractor on the same or a separate contract. *See Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1054 (Fed.Cir. 1993) (citing *Project Map, Inc. v. United States*, 203 Ct.Cl. 52, 56, 486 F.2d 1375, 1376–77 (1973), and *Dale Ingram, Inc. v. United States*, 201 Ct.Cl. 56, 76, 475 F.2d 1177, 1188 (1973)).

**8.** Because plaintiff failed to argue this claim in either its opposition to defendant's motion for summary judgment or its own cross-motion for summary judgment, the claim is deemed aban-

## DISCUSSION

Not surprisingly, the parties frame the key issue in this case differently. Defendant contends that the dispositive issue is "whether the parties properly implemented the terms of the underlying Contract as to each specific option in question." Def's Br. filed Feb. 20, 1998, at 7. According to defendant, the unit prices of the machines for both Option Year Two and the July 1994 Option should have been calculated by applying the 4% negotiated escalation rate to the original "all other costs" base figure of $107.83 rather than the once-adjusted figure of $109.99. In contrast, plaintiff contends that, by adopting the once-adjusted figure of $109.99 in her purchase orders for Option Year Two and July 1994 Option, the contracting officer accepted plaintiff's interpretation of the contract and, in doing so, created "valid, binding and enforceable contracts." Plf's Br. filed Mar. 6, 1998, at 7. The purchase orders thus had the effect, plaintiff argues, of modifying the contract and superseding the ambiguous and indefinite contract provisions.

During the course of this contract, Ms. Klinker issued several purchase orders through which the LOC exercised its options under the contract. The court must examine the purchase orders for Option Year Two and the July 1994 Option to determine whether they represent severable and separate contracts or are part and parcel of the underlying contract. Where "[t]he exercise of an option in a existing contract is not equivalent to the award of a new and different contract[,] it is an element in the continuation of a unitary package...." *Ocean Technology, Inc. v. United States,* 19 Cl.Ct. 288, 291 (1990) (quoting *C.M.P., Inc. v. United States,* 8 Cl.Ct. 743, 746 (1985)). If the orders are themselves enforceable contracts, however, no need arises to scrutinize the underlying contract, as the unit prices specified in the purchase orders would govern and plaintiff would prevail. However, if the purchase orders are not deemed to be separate, binding contracts, the language of the underlying contract must be examined and any ambiguity resolved. Plaintiff maintains that no con-

tract language directs the escalation rate to be applied to the original base "all other costs" figure. In fact, plaintiff notes that "neither the contracting officer nor the appeals officer could identify any contract language which required that interpretation." Plf's Br. filed Jan. 20, 1998, at 34.

### 1. *Nature and effect of options*

■ As plaintiff notes, FAR § 17.201, 48 C.F.R. § 17.201 (1997), defines an option as "a unilateral right in a contract by which, for a specified time, the Government may elect to purchase additional supplies or services called for by the contract, or may elect to extend the term of the contract." Plaintiff posits that, although the contract used the term "option," for three reasons none of its provisions "created or constituted a true option." Plf's Br. filed Mar. 6, 1998, at 12. First, section G.2 requires the escalation rate to be "negotiated with the exercise of each option year." Second, the contract does not provide a specific time to exercise or perform the options, nor is there a time limit for performance. Third, the quantity of units that may be ordered is without limitation. Furthermore, plaintiff argues, the contract "did not provide sufficient terms for an enforceable option." Plf's Br. filed Mar. 6, 1998, at 13. Plaintiff cites *Appeal of Klass Eng'g, Inc.,* ASBCA No. 22052, 78–2 BCA ¶ 13,236, *on motion for reconsideration,* 78–2 BCA ¶ 13,463, and *MPT Enterprises,* ASBCA No. 24716, 83–2 BCA ¶ 16,758, arguing that the issuance and acceptance of the purchase orders was supported by consideration and constituted severable, enforceable contracts.

Defendant hotly disputes plaintiff's characterization of the nature, purpose, and effect of the contract's option provisions to supersede the underlying contract and argues that "[e]ach option lacked the requisite consideration," which was "already provided in the underlying agreement itself." Def's Br. filed Feb. 20, 1998, at 6. The underlying contract is the only contract; if each purchase order

doned. *See Sheets v. United States,* 2 Cl.Ct. 101, 102 n. 2 (1983) (citing cases). Similarly, plaintiff's charge that actions of the contracting and

appeals officers were made in bad faith is also deemed abandoned.

represents a separate contract, then plaintiff's position would lead to the conclusion that not one but many contracts govern. According to defendant, exercising an option does not create a new contract, nor is the option severable from the original contract.

The underlying contract contemplated the use of purchase orders to effectuate the contract beyond the first year and the purchase orders also reference the underlying contract. For example, Purchase Order M70243, dated September 27, 1993, exercised Option Year Two and requested 46,711 talking book machines at a unit price of $170.58, "manufactured in accordance with the terms and conditions set forth in Contract I70243 Option Year 2." [9] Although it is true that the quantity and unit price were left open by the underlying contract, to be filled by subsequent purchase orders, these purchase orders are not "binding and enforceable modifications" and do not "supersede the underlying contract," Plf's Br. filed Jan. 20, at 23, as plaintiff asserts. These purchase orders depend for their existence on the underlying contract; they are not freestanding contracts.

Because the purchase orders do not constitute separate contracts, the language of the underlying contract governs this dispute. According to defendant, the LOC is not seeking to reform the contract, but to enforce its rights under the existing contract by implementing properly the specific options in question, Option Year Two and the July 1994 Option. As the contracting officer and appeals officer before it, defendant maintains that, in calculating the CPI adjustment, the contracting officer made a mistake in adopting a calculation that applied the CPI rate to the wrong base figure. The 4% CPI rate should have been applied to the original "all other costs" base figure of $107.83.

Under the yen adjustment clause (contract section G.3), the "[t]otal firm-fixed unit price on which award is based" would be applied only to "(A) Direct material costs (purchased

with yen)." Section G.3 also states that "[t]he price adjustment, if any, that is the result of paragraph G.2 above shall be applied only to the balance, *i.e.*, the total firm-fixed unit price LESS (A)." In other words, the CPI adjustment clause was to be applied to "all other costs" than those for materials purchased with yen. Defendant argues that, like the Yen Adjustment, "the CPI Adjustment [must also] be based upon the unit price upon which [the] contract was made." Def's Br. filed Feb. 20, 1998, at 10–11. Given the structure of the contract, this inference is altogether reasonable.

Defendant proceeds to demonstrate how plaintiff's position "double counts" the CPI adjustment for Option Year Two because the 4% escalation rate is applied to a base figure that already was adjusted by the original 2% escalation rate applied in Option Year One. Section G.2(1) of the contract dictates how the CPI rate was to be calculated:

> The escalation rate shall be negotiated with [the] exercise of each option year.
>
> . . . .
>
> (1). . . . An index shall be calculated by averaging the 12 seasonally adjusted months ending 3 months prior to the expiration of the first period of the contract. This average is then compared with the average index for the 12–month period ending 3 months prior to the beginning of the contract, called the base index.

Unfortunately, the contract only directs the calculation of the escalation rate and does not specify the base figure to which the rate should be applied to calculate the adjusted "all other costs" figure. However, just as the base period was the beginning of the contract for purposes of CPI rate calculation, the only reasonable inference is that the base "all other costs" figure—to which the CPI rate is applied—should be the original $107.83 figure used at the beginning of the contract. Although both the 2% escalation rate for Option Year One and the 4.02% escalation rate for Option Year Two appear

---

9. Plaintiff argues that the unit prices in the purchase orders control, relying on language in the purchase orders' additional terms and conditions: "The terms and conditions contained in this order govern in event of conflict unless

changes are accepted by The Library in writing." However, at the time when the purchase orders were issued, no conflict existed. This provision is not material to the instant dispute.

to have been calculated in accordance with section G.2(1) of the contract, the 4.02% escalation rate for Option Year Two was applied to the wrong "all other costs" figure. Applying this escalation rate to a figure that had already been adjusted by 2% inappropriately compounds the CPI adjustment well beyond inflation.

The key issue in this case is quite similar to that in *Appeal of Northwestern Development Co.*, GSBCA Nos. 6821, 7433, 84–3 BCA ¶ 17,613. The dispute focused on the amount of a rent increase due under a lease, as derived under a Tax Escalation clause. The clause at issue stated that "the annual rental rate will be adjusted to provide for increases or decreases in general real estate taxes." *See id.* at 87,743–44. The parties disputed which annual rental rate was to be used—the rate as of the last prior adjustment (including the tax escalation rate) or the rate agreed to without prior tax escalation. By way of numerical examples, the board illustrated graphically why the inclusion of the prior tax escalation resulted in "double counting," thereby compounding prior increases, and was thus an "implausible" interpretation of the clause. *See id.* at 87,748.

During oral argument, plaintiff attempted to distinguish *Northwestern Development Co.* on the ground that the board was called upon to interpret a disputed contract clause before it was implemented, whereas in the instant case the parties negotiated and agreed to particular quantities and prices through binding contract modifications and purchase orders. Plaintiff contends that the purchase orders at issue "resolved actual or potential disputes over contract interpretation of vague and ambiguous clauses." Plf's Br. filed Jan. 20, 1998, at 24. Plaintiff also cites *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1573–74 (Fed. Cir.1991), where the court deemed a negotiated modification, which included additional costs for a further option year, to be an enforceable agreement because it had settled an "ongoing dispute."

Plaintiff's interpretation of both *Northwestern Development Co.*, and *Aviation Contractor Employees* are inapposite, but illustrate an important distinction in this case,

one apparently also drawn by the appeals officer. Although the escalation rate was negotiated and arguably disputed, the application of this rate to the "all other costs" figure was not. Mr. Fulmore thus disallowed the LOC's recoupment of $11,212.70 for the March 1995 Order because the now-disputed escalation rate itself was negotiated earlier and thus bound the parties, much as the reasoning of *Aviation Contractor Employees*, 945 F.2d at 1573–74, suggests. In contrast, the application of the CPI rate to the previously adjusted "all other costs" figure was never disputed, never negotiated, and thus never bound the LOC. In fact, the misapplication of the rate to the wrong base figure was not even discovered by the contracting officer until March, 1995. Consequently, plaintiff's argument regarding negotiation of a disputed term is correct, but only insofar as it relates to the CPI rate itself, not the application of this rate to the "all other costs" figure, in accordance with contract sections G.2 and G.3.

### 2. *Ambiguity of CPI rate calculation and application to "all other costs" figure*

Although the doctrine of *contra preferentem* dictates that contract ambiguities be interpreted against the drafter, here the LOC, the contract clause must be susceptible to more than one reasonable interpretation. *See Interstate Gen. Gov't Contractors v. Stone*, 980 F.2d 1433, 1434 (Fed.Cir.1992); *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 767, 524 F.2d 680, 692 (1975) (citing *J.W. Bateson Co. v. United States*, 196 Ct.Cl. 531, 543, 450 F.2d 896, 902 (1971)). To prevail on an ambiguous contract provision, the contractor's interpretation need not be as or more reasonable than that of the Government, as long as it is, in fact, reasonable. *See United Pacific Ins. Co. v. United States*, 204 Ct.Cl. 686, 695, 497 F.2d 1402, 1407 (1974) (citing *Peter Kiewit Sons' Co. v. United States*, 109 Ct.Cl. 390 (1947)).

To interpret the contract, it " 'must be read as a whole ... [and] interpreted in a manner which gives meaning to all its parts and in such a fashion that the provisions do not conflict with each other, if this is reasonably possible.' " *Core–Vent Corp. v. Implant*

*Innovations, Inc.*, 53 F.3d 1252, 1258 (Fed. Cir.1995) (quoting *B.D. Click Co. v. United States*, 222 Ct.Cl. 290, 299, 614 F.2d 748, 753 (1980)). Section G.3 provides guidance as to how the CPI adjustment is to be calculated on an "all other costs" figure, one that does not include the direct material costs purchased with yen, but represents the balance, *i.e.*, the "[t]otal firm-fixed unit price [up]on which [the] award is based." Although section G.3 does seem to imply that the unit price to be adjusted is the price used when the contract was first awarded, section G.2 does not indicate which figure should be adjusted. Instead, section G.2 deals with the negotiation of the escalation rate upon the exercise of each option year and refers to the adjustment of "contract price of orders placed during the adjusted period." Plaintiff's interpretation of the contract allows the CPI rate to be applied to the $109.99 unit price figure, which included the previous CPI adjustment of 2%. The appeals officer stated that "it is only logical" that the CPI rate be applied to the original "all other costs" base figure of $107.83. Even though he did not explain why, it stands to reason that, if the CPI rate must be calculated using a base figure, the CPI rate at the contract's inception, the figure adjusted should also be the original unit price used during the beginning of the contract. This avoids compounding interim CPI increases by embedding them in unit prices that are repeatedly adjusted.

Furthermore, FAR § 16.203–2 provides instruction regarding the application of economic price adjustments:[10] "In establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause." To interpret the CPI adjustment clause to result in double counting, as plaintiff advocates, does not comport with either the FAR or logic and is not reasonable.

It is true that section G.2, the escalation rate clause, is not a paradigm of clarity. In order to determine the CPI adjustment, it is unclear to which "all other costs" base figure the negotiated escalation rate should be applied. Contrary to plaintiff's intimation, the appeals officer sought to explain the calculation of the rate itself rather than the application of the rate to the "all other costs" base figure. He identified the areas of confusion, as follows:

> While the application of the escalation rate is not a matter of interpretation of contract language, other items in the clause may be. To begin with, it is not clear what is exactly meant by "an adjusted period." This is further confused by the use of the term "orders." ... The correct use of this clause is even further confused by the use of the term "years" with regard to the options. The use of the term "years" gives the impression that options are to be exercised on some twelve month interval, which in turn would make the CPI period to be calculated consistent as well. However, that was not the case in reality over the course of the contract.

Mr. Fulmore proceeded to describe the difficulties in calculating the escalation rate, especially given different potential time periods with which the contracting officer could calculate the rate.

As part of his determination, Mr. Fulmore acknowledged that

> the question as to what rates should apply to the modifications made in July, 1994 and March, 1995 is very much open to interpretation. While I would prefer to base my determination on an interpretation of the clause, given the ambiguity of the clause that is not possible.... As the clause is ambiguous and the actions of the Contracting Officer were not consistent, I must make a determination based upon the actions of the parties at the time.

10. Plaintiff argues that the LOC regulations do not adopt the FAR, yet quotes the FAR for the definition of an option. Section I.1 of the contract itself adopts the FAR and incorporates numerous FAR provisions by reference. Although an argument exists that the LOC is a legislative agency and that the FAR only applies to executive agencies, *see Bowsher v. Synar*, 478 U.S. 714, 746 n. 11, 106 S.Ct. 3181, 3198 n. 11, 92 L.Ed.2d 583 (1986), the FAR nevertheless provides useful guidance for the application of the negotiated escalation rate in this case.

It is important to emphasize that the appeals officer was referring to the negotiation and calculation of the escalation rates themselves, not the application of those rates to the "all other costs" figure. Contrary to plaintiff's assertion, this latter application was not disputed, not negotiable, and did not modify the underlying contract.

Determining that the negotiated CPI rate was misapplied for Option Year Two, Mr. Fulmore calculated that the LOC was entitled to $103,698.52 [11] for the overpayment. Although no CPI adjustment was made for the July 1994 Option, the misapplication error that affected Option Year Two unit prices was carried into the base unit prices used to calculated the July 1994 Option, resulting in an additional overpayment of $11,726.00,[12] for a total overpayment of $115,424.52. Having already offset $127,781.84 as credit due under its claim, the LOC thus now owes plaintiff $12,357.32.[13]

This figure essentially represents the dispute over the CPI rate applied in the March 1995 Order. *See supra* note 6. Plaintiff's central argument regarding a binding contract modification is correct only insofar as it relates to the negotiation of the escalation rate itself, not as it relates to the mechanical application of this rate to the "all other costs" figure. Plaintiff incorrectly applied the 4% escalation rate to the previously adjusted "all other costs" per unit figure of $109.99, rather than $107.83 base figure, resulting in an inappropriate compounding of the CPI adjustment and an overpayment by the LOC. Mr. Fulmore's findings, the reasoning set forth by the board in *Northwestern Development Co.,* ¶ 87,748, FAR § 16.203–2, and the only reasonable reading of contract provisions G.2 and G.3, all compel this conclusion.

***

11. In short, the incorrect "all other costs" figure of $109.99 was used instead of the original figure of $107.83, for a difference (overpayment) of $2.16 per unit. Applying the 4.02% CPI rate to original "all other costs" figure results in a difference of $.06 per unit, for a total difference of $2.22 per unit. This might seem insignificant until one calculates the difference per order, which totaled 46,711 units: $103,698.52.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is granted to the extent of $12,357.32 and is otherwise denied. The Clerk of the Court shall enter judgment for plaintiff in the amount of $12,357.32.

**IT IS SO ORDERED.**

No costs.

***

12. According to Mr. Fulmore, this misapplication resulted in an amount due of $26,031.80. However, because the contracting officer had applied a lower CPI rate, her claim for the transaction was only $11,726.00, which was what the appeals officer deemed was due the LOC.

13. Mr. Fulmore calculated this amount to be $12,287.32, apparently making a subtraction error.