**Frank MICALIZZI, Plaintiff,**

v.

**Donald RUMSFELD, Secretary of Defense, United States of America and Merlin Express, Inc. Defendants.**

**No. 2:00–CV–473.**

United States District Court, D. Vermont.

Jan. 2, 2003.

E.William Leckerling, III, Christina A. Jensen, Lisman, Webster, Kirkpatrick & Leckerling, P.C., Burlington, VT, for Plaintiff.

Paul J. Van de Graaf, Office of the United States Attorney, District of Vermont, Burlington, VT, Laura E. Spatz, Haynes & Boone, San Antonio, TX, Michael W. Fox, Haynes and Boone, LLP, Austin, TX, Geoffrey J. Vitt, Vitt & Rattigan, PLC, Norwich, VT, for Defendant.

### OPINION AND ORDER

SESSIONS, Chief Judge.

This action stems from the termination of Frank Micalizzi's employment at Merlin Express, Inc. ("Merlin"). After his discharge Micalizzi filed an administrative complaint against Merlin with the Department of Defense ("DOD"), pursuant to 10 U.S.C. § 2409a (1988 ed. Supp. V, 1993) (repealed 1994), which prohibited discrimination against defense contractor whistleblowers. DOD determined that the complaint was not covered by the statute and refused to adjudicate it. Micalizzi seeks a declaration from this Court that his administrative complaint falls within § 2409a and an order requiring DOD to adjudicate his claim. Because the Court finds that the DOD properly determined that § 2409a does not cover his administrative complaint, Micalizzi's renewed motion for partial summary judgment (Doc. 29) is **DENIED** and the Defendants' motions for judgment on Count I are **GRANTED** (Docs.33, 34).

### I. Background

For purposes of deciding this motion the following material facts are not in dispute. On January 7, 1991, Fairchild Aircraft Incorporated ("FAI"), Merlin's parent company, and the United States Air Force entered into contract F34601–90–C–1331 (the "Merlin Contract"). R. at 480. Under this contract Merlin[1] agreed to provide maintenance and logistical support for certain aircraft manufactured by FAI. While the Merlin Contract specified the work to be done and certain pricing schedules, the final value of the contract was merely estimated because the specific locations and number of aircraft to be serviced and supported were not specified. Instead, the Merlin Contract authorized DOD to modify the contract unilaterally as aircraft were purchased and bases were identified.[2] R. at 511, 516, 523. Thus, DOD had the ability to alter substantially the funding obligated by the contract and did so through a series of modifications by which numerous base locations were added

---

1. Although the Air Force and FAI were the contracting parties, Merlin was Micalizzi's employer and will be referred to as the contracting entity for the sake of simplicity.

2. Thus while the value of the contract was estimated to be $55,284,535 if DOD chose to exercise all five of its expansion options, at the time the Merlin Contract was entered into DOD was obligated to pay only $14,335 for pre-operational costs. R. at 480, 482–87. According to the record, Merlin exercised at least two of the options. R. at 1005, 1054.

and funded. *See, e.g.*, R. at 993–1002; 1018–21; 1028–32; 1047–49; 1050–53.

In June of 1993 Micalizzi began employment with Merlin as an aircraft mechanic. He performed inspection and maintenance work pursuant to the Merlin Contract on aircraft used by the Vermont Air National Guard (VTANG). Micalizzi's employment with Merlin was terminated on August 12, 1993 after he made complaints to VTANG officials about the adequacy of certain of Merlin's maintenance practices.

On February 4, 1994 Micalizzi filed a complaint with DOD pursuant to 10 U.S.C. § 2409a(1) (1988 ed. Supp. V, 1993) (repealed 1994) and the implementing regulations promulgated by DOD, DOD Federal Acquisition Regulation Supplement ("DFARS"), subpart 203.7104 (Doc. 29, Ex. C). In this complaint Micalizzi contended that his discharge was in reprisal for reporting the alleged deficiencies in Merlin's maintenance of the aircraft.

Section 2409a prohibited discharge of employees of defense contractors who disclosed "to an appropriate Government official information concerning a contract between the defense contractor and [DOD] which the employee reasonably believes evidences a violation of" federal law or regulations related to the subject matter of the contract or DOD procurement. 10 U.S.C. § 2409a(b). The statute and the regulations promulgated pursuant to § 2409a created an administrative process for investigation and adjudication of such complaints.

Pursuant to this process, the Defense Logistics Agency ("DLA") forwarded the complaint to the DOD Inspector General for investigation. DFARS, subpart 203.7105. On May 28, 1997 the DOD Inspector General issued a written report concluding that Micalizzi's discharge was in reprisal for his disclosures to VTANG officials. The Inspector General then referred Micalizzi's complaint to DLA for adjudication.

After requesting and receiving written information and argument from Micalizzi and Merlin, however, DLA determined that Micalizzi's complaint was not covered by § 2409a and thus could not be adjudicated under that statute. Specifically, DLA found that the Merlin Contract was created prior to the effective date of § 2409a. Section 2409a's application is limited to contracts for an amount greater than $500,000, § 2409a(a), and entered into on or after May 4, 1991, *see* National Defense Authorization Act for Fiscal Year 1991, Pub.L. No. 101–510, § 837(b) (1990).[3] The Merlin Contract was entered into on January 7, 1991.

Micalizzi filed the instant action on December 22, 2000 seeking a declaratory ruling from this Court that his complaint was covered by § 2409a and asserting various state law claims against Merlin. Micalizzi then moved for summary judgment on his § 2409a claim asserting that certain modifications to the Merlin Contract, occurring after May 4, 1991, triggered application of § 2409a. On September 20, 2001 the Court issued a stipulated order remanding the case to DLA for a determination of whether the modifications triggered § 2409a. On December 13, 2001, after receiving additional written argument from Micalizzi and Merlin, DLA issued a Memorandum of Decision determining that the modifications did not trigger application of § 2409a. In reaching this conclusion DLA evaluated each of the modifications occurring after the effective date of § 2409a. Based on the scope of the original Merlin

---

**3.** This section provides that § 2409a "shall apply to contracts entered into during the period beginning on the date which is 180 days after the date of enactment of this Act." Pub.L. No. 101–510, § 837(b). The date of enactment was November 5, 1990. *Id.*

Contract and federal case law addressing when a contract modification may be deemed a new contract, DLA found that the modifications were within the scope of the original contract and thus were not separate contracts triggering application of § 2409a:

> The contract was for aircraft logistics support and all administrative and procurement modifications were designed to fulfill the original purpose of the contract. The fact that the modifications made changes, including increasing sites for funding, does not transform them into new contracts.

Mem. of Decision at 6 (Doc. 28).

Micalizzi's renewed motion for summary judgment challenges this determination. Specifically, Micalizzi argues that three of the modifications considered by DLA—P00005, P00006, and P00014 [4]—involve amounts over $500,000 and should be considered contracts within the reach of § 2409a.

## II. Discussion

### A. Standard of Review

In essence, Micalizzi requests this Court to review DLA's interpretation of "contracts entered into," and its conclusion that the modifications at issue in this case are not "contracts entered into" for purposes of § 2409a. Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). At issue is whether the modifications are, as a matter of law, "contracts entered into" such that DLA was required to adjudicate Micalizzi's complaint under § 2409a.

■ The first question to be answered is what standard of review the Court

should use in reviewing DLA's interpretation of § 2409a. Micalizzi's complaint seeks declaratory relief, however, the Declaratory Judgment Act, 28 U.S.C. § 2201, does not create an independent basis for subject matter jurisdiction in a suit against the United States and its agencies. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). The Administrative Procedure Act ("APA"), however, represents a general waiver of sovereign immunity by the United States where an individual has suffered a legal wrong because of, or has been adversely affected or aggrieved by, agency action and seeks equitable relief. 5 U.S.C.A. § 702 (West 1996); *Presidential Gardens Assocs. v. United States*, 175 F.3d 132, 143 (2d Cir.1999). Thus, Micalizzi's challenge will be reviewed under the standards of the APA.

■ Under the APA, a final agency action may not be upheld if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C.A. § 706 (West 1996). This review is " 'narrow,' limited to examining … 'whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Natural Resources Defense Council, Inc. v. Muszynski*, 268 F.3d 91, 97 (2d Cir.2001) (quoting *City of New York v. Shalala*, 34 F.3d 1161, 1167 (2d Cir.1994)).

■ When a court reviews an agency action involving interpretation of a statute the agency administers, the agency's decision may be entitled to additional deference. Where Congress has intended an agency to speak with the force of law and the agency interpretation at issue was promulgated in the exercise of that authority,

---

**4.** As discussed in more detail below, these modifications each involved the addition of base locations to the Merlin Contract, as well as funding increases necessary to support Merlin's work at these bases.

an administrative interpretation of a particular statutory provision is deferentially reviewed under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *United States v. Mead Corp.,* 533 U.S. 218, 227–28, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *Chao v. Russell P. Le Frois Builder, Inc.,* 291 F.3d 219, 226 (2d Cir.2002). Under *Chevron,* the Court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. If Congress has not directly spoken, then the Court must consider whether DLA's interpretation of § 2409a is "based on a permissible construction of the statute," that is, whether its interpretation is a reasonable one. *Id.* at 843–44, 104 S.Ct. 2778. The Court must defer to any such reasonable interpretation, even if "the agency's chosen resolution seems unwise." *Mead Corp.,* 533 U.S. at 229, 121 S.Ct. 2164. *See also Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (court is obligated to follow the agency construction if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent.").

■ Before proceeding to the two-step *Chevron* analysis, the Court must determine whether DLA's decision is one which is appropriate for this analysis. In considering whether the *Chevron* analysis should be applied to a particular agency decision, the Supreme Court has instructed that "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Mead Corp.,* 533 U.S. at 230, 121 S.Ct. 2164. Accordingly, *Chevron* deference has been extended to notice-and-comment rulemaking and formal adjudications, as well as interpretations involving less administrative formality. *Id.* at 230–31, 121 S.Ct. 2164. *See also Heimmermann v. First Union Mort. Corp.,* 305 F.3d 1257, 1261–62 (11th Cir. 2002) (agency statement of policy); *Fed. Election Comm'n v. Nat'l Rifle Ass'n of Am.,* 254 F.3d 173, 184–85 (D.C.Cir.2001) (agency advisory opinion).

There can be little question that Congress intended DOD to speak with the force of law in administering § 2409a. The statute required DOD to promulgate regulations necessary to carry out the investigation and adjudication framework it detailed. § 2409a(a). DOD was to adjudicate whistleblower complaints "on the record after notice and an opportunity for an agency hearing." § 2409a(c)(4)(E); *cf.* 5 U.S.C.A. § 554 (West 1996) (defining formal adjudication as an adjudication required by statute "on the record after notice and an opportunity for an agency hearing."). Adjudication procedures were to be "as informal as practicable, consistent with principles of fundamental fairness." § 2409a(c)(4)(E).

DLA followed these procedures. Its interpretation was developed after receiving written briefing from the parties. Its written decision provides a thorough analysis explaining its basis and is intended to resolve the rights of the parties under § 2409a. *Cf. Mead Corp.,* 533 U.S. at 233–34, 121 S.Ct. 2164 (*Chevron* analysis inappropriate where agency opinion letter rulings not intended by agency or Congress to carry force of law); *Chao,* 291 F.3d at 227 (agency position first advanced in litigation without regulations, rulings, or administrative practice lacks force of law to receive *Chevron* deference).

■ Micalizzi argues, however, that the two-step *Chevron* analysis should not be applied to this case because DLA deter-

mined that it did not have jurisdiction to adjudicate the claim after first forwarding the complaint to the DOD Inspector General for investigation. It is true that when an agency has issued inconsistent interpretations of the same statutory provision, its current interpretation may be entitled to less deference. *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 515, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). There is no evidence in the administrative record, however, that DLA's determination constituted an "informal reversal of a long-standing contrary position," as Micalizzi contends. Pl.'s Reply to Defs. Opp'n (Doc. 36) at 4. DLA's first ruling directly on the modification issue occurred in late 2001 after remand from this Court. Neither its previous 2000 finding of no jurisdiction, a decision consistent overall with the 2001 finding, nor the DOD Inspector General's 1997 investigative report, provided any analysis of the applicability of § 2409a to contract modifications.[5]

■ That DOD initially processed and investigated Micalizzi's administrative complaint is not equivalent to a ruling on the applicability of § 2409a to contract modifications.[6] Nor has Micalizzi identi-

fied other adjudications in which DLA has taken a contrary stance. Indeed, the fact that DOD did not require inclusion of the § 2409a contract clause[7] in any of the Merlin Contract modifications indicates that it did not previously consider such modifications to trigger § 2409a. Accordingly, the Court will undertake the two-step *Chevron* analysis in reviewing DLA's interpretation.

## B. DLA's Ruling

■ Section 2409a applies to "each contract entered into by a contractor and [DOD] for an amount greater than $500,000," § 2409a(a)(2), but limits this application to "contracts entered into" on or after May 4, 1991, Pub.L. No. 101–510 § 837(b). In its written decision, DLA concluded that none of the modifications identified by Micalizzi were "contracts entered into" after May 4, 1991, because each was " 'fairly and reasonably within the contemplation of the parties when the [Merlin Contract] was entered into.' " Mem. of Decision at 6 (quoting *Freund v. United States,* 260 U.S. 60, 63, 43 S.Ct. 70, 67 L.Ed. 131 (1922)).

Micalizzi admits that the term "contract" is not "explicitly" defined by § 2409a and also that there is no mention of modifica-

---

**5.** With regard to jurisdiction, the DOD Inspector General's report notes only that DLA "reviewed Mr. Micalizzi's complaint and determined it met the criteria for investigation pursuant to 10 U.S.C. 2409a, including that the value of contracts between [Merlin] and [DOD] exceeded $500,000" at the time Micalizzi's complaint was filed. R. at 6.

**6.** Even if DLA had issued conflicting rulings on the modification issue, an agency is not "disqualified from changing its mind" nor "estopped from changing . . . a mistaken legal interpretation." *Callaway v. C.I.R.,* 231 F.3d 106, 132 (2d Cir.2000) (citing *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993)). *See also Rust,* 500 U.S. at 187, 111 S.Ct. 1759 (agency

interpretation entitled to deference despite constituting "a sharp break with prior interpretation."). Deference is still owed "where the agency's interpretation . . . is at least as plausible as competing ones," *Thomas Jefferson Univ.,* 512 U.S. at 517, 114 S.Ct. 2381 (internal quotations omitted), and represents its "fair and considered judgment," *Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). As discussed below, DLA's interpretation is a reasonable one. Moreover, there is no indication that it does not represent DLA's "fair and considered judgment."

**7.** Each contract subject to the § 2409a prohibitions was to contain a clause requiring compliance with the regulations. § 2409a(a).

tions to existing contracts in § 2409a. Similarly, Micalizzi has not offered any language or legislative history of the statute indicating that Congress directly addressed the issue of whether modifications to an existing contract qualify as new contracts separately covered by § 2409a.

Instead, Micalizzi argues that by not defining "contract" in a specialized manner, Congress implicitly intended it to take on the broad customary meaning of the term, which he contends includes modifications of existing contracts. It is true that "[s]tatutory analysis begins with the plain meaning of the statute ... [which] can be extrapolated by giving words their ordinary sense." *Muszynski*, 268 F.3d at 98. However, Micalizzi has not provided a convincing "plain meaning" definition of "contract" to support his assertion that the modifications at issue here are ones customarily included in the term "contract".

 Micalizzi first cites a definition included in the 1957 edition of Black's Law Dictionary: "[a] promissory agreement between two or more persons that creates, *modifies*, or destroys a legal relation." Pl.'s Renewed Mot. for Partial Summ. J. at 14 (quoting Black's Law Dictionary at 397 (4th ed.1957)) (emphasis added).[8] Alternatively he contends that the customary meaning of contract in this context is found in Federal Acquisition Regulation ("FAR") 2.101, which contains an extremely broad definition of contract, including "bilateral modifications." 48 C.F.R. § 2.101 (1990).[9] As a general rule, and in the context of federal acquisition contracts, however, modifications within the scope of the original contract do not constitute new or separate contracts. *See, e.g., VHC, Inc. v. Peters,* 179 F.3d 1363, 1366 (Fed.Cir. 1999) (exercised option included as an option within the original contract "be[comes] part of a single unitary contract"). DLA's interpretation relied on this view of the modifications.

Even assuming that modifications are generally considered to be within the customary meaning of contract, the relevant question is whether the exercise of an option explicitly contemplated in the original contract can be said to modify an existing legal relation in such a way so as to fit within this customary definition. Because neither the language of the statute nor the plain meaning of "contract" speaks directly to this specific issue, the Court will consider whether DLA's interpretation of

---

8. Notably, "modification" is not included in the definitions found in the most recent edition of Black's. *See* Black's Law Dictionary at 381 (7th ed.1999). Nor has Micalizzi provided the Court with such a definition from the edition existing in 1990 when § 2409a was drafted.

9. The complete definition is:

a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing. In addition to bilateral instruments, contracts include (but are not limited to) awards and notices of awards; job orders or task letters issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance; and *bilateral contract modifications.*

48 C.F.R. 2.101 (1990) (emphasis added). Broad should not be equated with customary, however. In presuming that Congress intended to incorporate this definition, it must also be presumed that any of the other documents listed in the definition could also trigger § 2409a. However, it is questionable whether all of these documents are customarily considered contracts or that Congress intended to incorporate these additional terms into § 2409a. *See Sprint Spectrum LP v. Conn. Siting Council,* 274 F.3d 674, 677 (2d Cir.2001) (courts should not read unstated terms into legislation when engaging in statutory interpretation).

§ 2409a is a permissible one. As discussed below, both the language of § 2409a and the history of the statutory scheme protecting defense contractor whistleblowers are consistent with DLA's conclusion that § 2409a was intended to apply only to new contractual relationships, not modifications contemplated by existing contractual relationships. Thus DLA's interpretation is a reasonable one to which the Court must defer.

Enactment of § 2409a provided greater protections to defense contractor whistleblowers than the preceding whistleblower statute, 10 U.S.C. § 2409, that it suspended. *See* 10 U.S.C. § 2409(d) (1988 ed. Supp. V, 1993) (making 10 U.S.C. § 2409 inapplicable to complaints covered by 10 U.S.C. § 2409a while § 2409a is in effect). Unlike § 2409, which provided only for investigation of employee complaints, 10 U.S.C. § 2409(b)(1988), § 2409a required DOD to promulgate regulations prohibiting whistleblower discrimination by defense contractors and to conduct formal adjudications of complaints made under the statute, and it afforded specific remedies to employees found to have been subjected to discrimination, § 2409a(c). As discussed above, however, Congress limited application of these greater protections to contracts entered into after May 4, 1991. Section 2409a also directed that the regulations require such defense contracts to contain a clause mandating compliance with the regulations. This requirement further highlights Congress' focus on newly negotiated, as opposed to existing, contracts. *See also* H.R.Rep. No. 101–655, at 314 (1990) *reprinted in* 1990 U.S.C.C.A.N. 2931, 3040 (stating that the contract clause requirement would apply to "[a]ll *new* contracts" meeting the $500,000 purchase amount) (emphasis added).

Given the new regulatory process and penalties faced by defense contractors, the focus on new contracts made sense. It would avoid the costs and administrative difficulties of imposing new rules of conduct in the midst of ongoing contractual relationships. *See Ocean Tech., Inc. v. United States,* 19 Cl.Ct. 288, 291 (Cl.Ct. 1990) (deferring to agency interpretation that statutory interest penalty provisions should be applied to contracts issued after a certain date, because doing so would promote "more orderly administrative transition" and consideration of "payment terms ... at the same time that other contractual provisions are entered into."). Applying the new regulatory regime and penalties to modifications within the scope of pre-existing contracts would be inconsistent with Congress' desire to limit the application of § 2409a to newly negotiated contracts. DLA's conclusion that the scope of the original contract should determine whether a modification triggered the application of 2409a is thus a reasonable one in light of the statutory scheme being implemented. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35–36, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) ("[a] central tenet of interpretation[ ][is] that a statute is to be considered in all its parts when construing any one of them"); *Auburn Hous. Auth. v. Martinez,* 277 F.3d 138, 144 (2d Cir.2002) ("[T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute.") (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).

■ The reasonableness of DLA's interpretation is further demonstrated by the legal precedent upon which it relied. Courts have generally found that modification of an existing contract does not create a new contract when the modification was contemplated by the original contract. *See VHC, Inc.,* 179 F.3d at 1366; *Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1275 (Fed.Cir.1999) ("Obligations

arising from the exercise of an option are part of a new contract only when the option was the principal subject matter of the bargain, *i.e.*, an option contract."); *Storage Tech. Corp. v. CCL Serv. Corp.*, 94 F.Supp.2d 697, 702 (D.Md.2000); *Telex Communications, Inc. v. United States*, 40 Fed. Cl. 703, 709 (Fed.Cl.1998); *Unified Indus., Inc. v. United States*, 24 Cl.Ct. 570, 574–75 (Cl.Ct.1991); *C.M.P., Inc. v. United States*, 8 Cl.Ct. 743, 746 ("The exercise of an option in an existing contract is not equivalent to the award of a new and different contract . . . ."). Thus, in applying a statute to a contract entered into prior to the statute's effective date, but modified after that date, the modification does not constitute a new contract subject to the statute where the modification was part of the original contractual understanding. *See Int'l Bus. Invs., Inc. v. United States*, 21 Cl.Ct. 79, 80 (1990) (interpreting the Prompt Payment Act); *Ocean Tech.*, 19 Cl.Ct. at 293 (same); *Jackson v. U.S. Postal Serv.*, 799 F.2d 1018, 1022 (5th Cir.1986) (interpreting the Contract Disputes Act).

There appears to be little dispute that the modifications cited by Micalizzi—P00005, P00006, and P00014—were within the scope of the Merlin Contract. Certain line item numbers included in the contract were "funded based upon one aircraft to be supported by" Merlin at each base. R. at 511, Merlin Contract § G–901(b). However, the Air Force reserved the right to change this funding amount when it exercised each yearly extension option "based upon the number of aircraft to be covered in that Fiscal Year." *Id.* The Merlin Contract provided "that any aircraft acquisi-

tions . . . [would] be logistically supported under" the contract and that as such "additional aircraft options" were exercised, they would be included in the contract using the firm fixed prices already agreed to by the parties. R. at 523, § H–901. *See also* R. at 529, §§ I–92 to –94 (reserving Air Force's right to unilaterally increase the quantity of supplies and services delivered by Merlin). Accordingly, the Air Force reserved the right to change the funds allotted to the line items included in the Merlin Contract "on a unilateral basis by modification to the contract." R. at 516, § H–89(c).

As DLA concluded, modifications P00005, P00006, and P00014 each fell within the base and funding addition process contemplated in the Merlin Contract. The Air Force used P00005 to clarify the descriptions of funding established in P00004 for the bases it added to the Merlin Contract coverage in P00003. Modifications P00006 and P00014 similarly added bases and funding[10] according to the process outlined in the Merlin Contract. P00006 also included three additional modifications. It replaced four contract data requirement list items, a contract data requirements list concerning addresses, and the contractor logistics support statement of work, although these modifications did not alter the contract price. R. at 1028, 1033–1039; Mem. of Decision at 2.[11] DLA concluded that these changes "primarily concerned contract reporting, management status, and a minor change in the statement of work" and that they simply "clarified the manner" in which obligations in the original contract would be performed.

---

**10.** As a result of these additions, P00006 increased the obligated amount by $1,031,000, R. at 1026, and P00014 increased the obligated amount by $7,569,250, R. at 993.

**11.** Thus, even if these minor modifications could be considered to be outside the scope of

the original contract, they would not meet the $500,000 requirement of § 2409a. The same can be said for all the modifications contained in P00005. The paperwork accompanying the P00005 funding clarifications does not include a change in contract price. R. at 1040.

Mem. of Decision at 6. *See Air–A–Plane Corp. v. United States,* 187 Ct.Cl. 269, 408 F.2d 1030, 1033 (1969) (in evaluating whether modifications are beyond the scope of a contract the focus is the magnitude and quantity of changes ordered and the cumulative effect of the changes); *see also PCL Const. Servs., Inc. v. United States,* 47 Fed.Cl. 745, 804 (2000). There is nothing arbitrary or capricious in this conclusion.

■ Micalizzi argues, however, that DLA'S construction is inconsistent with the policy behind § 2409a's broad prohibition against retaliation because it, in effect, permits retaliation against a whistleblower to occur in this case without remedy by § 2409a. However, as discussed above, Congress was also concerned that § 2409a apply only to new contracts, presumably to avoid confusion and costs. DLA's construction balances both these policies and is precisely the kind of agency choice to which a court should show deference: "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned" the court should not disturb "a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *Chevron,* 467 U.S. at 845, 104 S.Ct. 2778. Moreover, Micalizzi's concern that DLA's interpretation would permit a contractor to evade § 2409a by entering into a contract for less than $500,000 and subsequently modifying it in amounts greater than $500,000 is unwarranted. Had such a contract been entered into and modified during the time period in which § 2409a was in effect, the original contract as modified could still be covered by the statute under DLA's construction. In contrast, this case involves an original contract that, based on the date of contract formation, was not intended by Congress to be covered by § 2409a.

Micalizzi also argues that the legal precedent upon which DLA relied is inapplicable because it relates to unilateral, as opposed to bilateral, modifications, and P00005 and P00006 were signed by both the government and Merlin. While most of these cases appear to have involved unilateral modifications,[12] the unilateral or bilateral nature of the modifications was not a determinative factor. Instead, the courts focused on whether the modifications were within the scope of the original contract. Although the existence of a unilateral modification may constitute evidence that the changes included in the modification were within the scope of the original contract, as discussed above, the language in the Merlin Contract clearly expressed the intent of the parties to cover the kind of changes involved in the modifications cited by Micalizzi.

In sum, DLA's determination that it did not have jurisdiction to adjudicate Micalizzi's complaint was based on a permissible construction of § 2409a. Accordingly, Micalizzi's request for declaratory relief must be denied.

### III. Conclusion

Wherefore, Micalizzi's renewed motion for partial summary judgment (Doc. 29) is **DENIED** and the Defendants' motions for judgment on Count I are **GRANTED** (Docs.33, 34). Count I is dismissed. As

---

12. In fact, *Telex Communications* involved two purchase orders, at least one of which was included in a bilateral modification. 40 Fed.Cl. at 706. The court, however, focused on the nature of the changes and the scope of the initial contract in finding that this modification did not constitute a new and separate contract. 40 Fed.Cl. at 709. *See also Ocean Tech.,* 19 Cl.Ct. at 293 (focusing not on fact that the modification at issue was bilateral, but on the fact that it was not part of, nor intended to implement, the original contract, and thus was a new contract).

Count I is the only claim against the Secretary of Defense, he is dismissed.